### Vincent J. BARTIMO

v.

### HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION and Horsemen's Credit Union.

### Civ. A. No. 81–2258.

United States District Court, W.D. Louisiana, Shreveport Division.

Aug. 28, 1984.

Robert G. Pugh and Robert G. Pugh Jr., Pugh & Pugh, Shreveport, La., for plaintiff.

John D. Collinsworth, Cook, Yancey, King & Galloway, Shreveport, La., for Horsemen's Benev. Protective Assn. and Home Ins. Co.

Charles R. (Chuck) Minyard, Broadhurst, Brook, Mangham, Hardy & Reed, Lafayette, La., for Racing Journal, Thomas Russell and Horsemen's Credit Union.

### RULING FROM THE BENCH *

STAGG, Chief Judge.

Rule 41(b) of the Federal Rules of Civil Procedure provides that a plaintiff's complaint may be dismissed involuntarily at the close of his case-in-chief on the ground that, upon the facts and the law, the plaintiff has shown no right to relief. The

---

* The press of my caseload requires that all cases be decided by rulings from the bench. The usual opening caveat reserves the right to reduce the oral ruling to writing with proper grammar and punctuation and complete citations of authority (without, of course, changing findings or conclusions). Notice of appeal having been filed in this matter, it is appropriate that the ruling, *viva voce*, now be put in written form.

Horsemen's Benevolent and Protective Association ("H.B.P.A."), Home Insurance Company, Thomas Russell and *Racing Journal*, all defendants herein, have made a motion for involuntary dismissal of Vincent J. Bartimo's claims pursuant to Rule 41(b).

Although it may take me a good part of the afternoon properly to explain why I find that I must grant the motion under 41(b), I say it in the beginning to remove the suspense and theatrics that attend when the parties wonder what the judge is going to say. I believe you should know that while I might find the law to be disagreeable, I am not in a position to deviate from it. I found, in fact, something that gave me some hope for the future when I was reading in the *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). In Section III, the court noted:

> It is nevertheless urged by respondent that the balance struck in *New York Times* should now be modified to provide further protection for the press when sued for circulating erroneous information damaging to individual reputation. *It is not uncommon or improper, of course, to suggest the abandonment, modification, or refinement of existing constitutional interpretation, and notable developments in First Amendment jurisprudence have evolved from just such submissions.* But in the 15 years since *New York Times*, the doctrine announced for that case, which represented a major development and which was widely perceived as essentially protective of press freedoms, has been repeatedly affirmed as the appropriate First Amendment standard applicable in libel actions brought by public officials and public figures.

99 S.Ct. at 1645 (emphasis added).

■ The grounds for the granting of the Rule 41(b) motion are that, by Mr. Bartimo's evidence, he has failed to establish that Russell and the other defendants published the offending article with "actual malice" as that term is *now* defined in the federal jurisprudence. This district court, like any other, is required now to make findings of fact and to reach conclusions of law under Rule 41(b).

FINDINGS OF FACT:

There is no question, as a preliminary matter, that the case is properly within the jurisdiction of this court, and there is no issue as to the propriety of the parties, or the joinder of issues. There is no need at this time to repeat the stipulated facts that were contained in the Pretrial Order and read into the record at the beginning of trial. *See*, Appendix I.

It suffices to say that Mr. Bartimo alleges that he was defamed under Louisiana law by the article entitled "Outrage!," which was written by Mr. Russell, and published in the first issue of *Racing Journal* in October 1981. See Appendix II. It has been established positively that Mr. Russell was the author of the article, and that he was responsible for the publication, editing, printing and distribution of the magazine. I find as a fact that the initial issue of *Racing Journal*, and all subsequent issues of the magazine were sponsored and funded by the Louisiana Division of the H.B.P.A. This fact is well established, not only by the testimony of the members of the Board of Directors of the Louisiana Division of the H.B.P.A. and the Minutes of Board meetings of the organization, but also the testimony of Mr. and Mrs. Russell.

According to Mr. Bartimo's complaint, his reputation was seriously impuned by the allegations in the article linking him to elements of the Mafia, and referring to him by the pejorative nickname of "Snake." Additionally, Mr. Bartimo complains of the reference to him in the article as "hit man," along with the implication that such "hit men" are known to dispose of their opponents by deadly and violent means. Mr. Bartimo testified on direct examination that he was not, nor had he ever been, a member of the Mafia or any known affiliate of the Mafia. He testified that he had never been referred to by the pejorative nickname of "Snake." He also testified that he had never made the assertion that he owned or controlled members of the

Louisiana Racing Commission; he asserted that he has suffered personal harm, personal damage to his reputation, his ability to earn a living, and his peace of mind, all as a result of the article's appearance in the *Racing Journal.*

I listened carefully to the evidence about Mr. Bartimo's reputation. If I were in the box, I would want to hear reputation testimony from such persons as those called by Mr. Bartimo. Their testimony tended to prove that Mr. Bartimo's reputation *has not* been damaged by the allegations written by Mr. Russell. To the contrary, all of the character witnesses called to the stand to testify stated that Mr. Bartimo enjoyed an excellent reputation in this community both before *and after* October of 1981.

Insofar as the allegations about job opportunities referred to in Mr. Bartimo's deposition and direct testimony. I find that he has, in fact, interviewed persons involved in the horse racing business who were seeking to obtain his advice and services, or both. These interviews were not at all affected by anything that Tom Russell or others might have said or written about Mr. Bartimo.

Because of my factual findings and the state of current libel law jurisprudence, I find that Mr. Bartimo failed to establish liability on the part of any defendant, and it is, therefore, not necessary to determine the extent of damages suffered by way of embarrassment, humiliation or emotional distress. Should on some future day I am found to have decided this case wrongfully, there will be sufficient time to take up the matter of damages.

LEGAL STANDARDS:

The legal standards which I must apply were well briefed by the lawyers. I say this because counsel for Mr. Bartimo is going to find that I put the emphasis on a particular case that I read differently than he does.

Defamation by way of libel traditionally established a cause of action in tort in both common law and under Louisiana Civil Code art. 2315. In *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the United States Supreme Court determined that libelous utterances fall within the area of constitutionally protected speech. *See, Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). Thus, I am required to evaluate Mr. Bartimo's defamation claims according to the provisions of Louisiana law as circumscribed by constitutional protections heavily written in the federal jurisprudence. The legal milieu is complex and, at times, frustrating. However, I am required to evaluate Mr. Bartimo's claims in this context.

The case of *Manale v. City of New Orleans, Department of Police,* 673 F.2d 122, 125 (5th Cir.1982), says these are four elements to be considered under Louisiana libel law:

1. Publication, *i.e.,* communication to some third person;
2. Falsity;
3. Malice; and
4. Resulting injury.

The *New York Times* case, *supra,* and its progeny placed a constitutional restraint on state law by requiring proof by clear and convincing evidence that the alleged defamatory remarks leveled at a "public official" or, now, "public figure," were made with "actual malice," not implied malice. In another landmark decision, the United States Supreme Court, expanding on *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), held in *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), that the "actual malice" standard also applied to "public figures." In *Gertz,* the court defined a "public figure" in the following terms:

> Respondent's characterization of petitioner as a public figure raises a different question. That designation [public figure] may rest on either of two alternative bases. In some instances, an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby be-

comes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

94 S.Ct. at 3012–13.

The Supreme Court justified its distinction between public officials and private citizens who became public figures and regular private citizens in *Gertz* in the following manner:

> [W]e have no difficulty in distinguishing among defamation plaintiffs. The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.

*Id.* at 3009. Applying the standards of *Gertz*, I began late yesterday afternoon with the assertion that I found Mr. Bartimo to be a "public figure."

Now, if the concept of actual malice is to be understood at all, it can only be understood in this case by reading what the Court *says* the concept means—because the term is not what you and I might conclude it is by merely reading the words.

■ "Actual malice" is defined by the Supreme Court as "knowledge that the statement was false or was made with reckless disregard of whether it was false or not." *New York Times*, 84 S.Ct. at 725–26; *Golden Bear Distributing Systems v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir.1983). Whether a defendant acted in "reckless disregard" of the truth or falsity of his statement must be determined by applying the following standard:

> There must be sufficient evidence to permit the conclusion that the defendant, in fact, entertained serious doubts as to the truth of his publication.

*St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Golden Bear Distributing Systems, supra*, at 950; *Herbert v. Lando, supra*, 99

S.Ct. at 1639. In *St. Amant*, the Court specifically noted, "that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Id.* 88 S.Ct. at 1325. Thus, it has been well established in the federal jurisprudence that failure to investigate does not constitute "reckless disregard," *per se.*

*St. Amant* placed some restrictions on the protection granted by the "reckless disregard" standard:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

88 S.Ct. at 1326. *See also, Herbert*, 99 S.Ct. at 1643, note 12.

Because of the importance of our First Amendment guarantees, the Supreme Court has placed a most heavy burden of proof on a public figure seeking defamation damages. The most recent reassertion of this heavy burden was set forth by the Court in *Bose Corp. v. Consumers Union of U.S., Inc.*, —— U.S. ——, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984):

> The burden of proving "actual malice" requires a plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.

104 S.Ct. at 1965, note 30. Likewise, in *Brewer v. Memphis Publishing Co., Inc.,* 626 F.2d 1238 (1980), the United States Court of Appeals for the Fifth Circuit applied this heightened burden of proof imposed on a public figure plaintiff in a defamation action.

CONCLUSIONS:

■ During Mr. Bartimo's testimony yesterday, I made the express finding that Mr. Bartimo was a "public figure," as contemplated by the federal jurisprudence. There can be no question that Mr. Bartimo was the subject of extensive media coverage and public attention during his tenure as president and general manager of Louisiana Downs. Ms. Marie Gifford Wright, the retired manager of a local radio station, testified that Mr. Bartimo frequently appeared in the press as a result of his position. She stated that Mr. Bartimo's activities "generated a lot of press," and that many of Mr. Bartimo's activities were "in the public interest." She stated that Mr. Bartimo regularly held press conferences which the media representatives attended, and that Mr. Bartimo's managerial actions were generally reported on in the media.

Mr. Bartimo's own testimony corroborated and effectively reiterated that of Mrs. Wright. He admitted that Louisiana Downs and its officials were the center of public interest and concern during the period 1980 through 1982, and that events related to the track generated substantial press coverage. It must be concluded in light of *Gertz, Brewer* and *Rebozo v. Washington Post,* 637 F.2d 375 (5th Cir. 1981), that Mr. Bartimo was a "public figure" actively involved in matters of extensive public attention, and that he voluntarily injected himself into these matters.

As set out above, in order to prevail in any defamation action, the plaintiff must prove that the defendants' assertions were published, and that the assertions were false. There can be no question of publication in this case. Over 5,000 copies of the "Outrage!" article were distributed to individuals involved in the horse racing industry, the press, public officials and others.

Thus, Bartimo established publication of the "Outrage!" article.

It is my opinion, and I expressly find, that the statements concerning Mr. Bartimo printed in the "Outrage!" article contained in the October 1981 issue of *Racing Journal* were false. Mr. Bartimo expressly denied any link with organized crime, particularly the Mafia, or any other criminal activities, and this testimony was unrebutted. The defendants failed to produce one shred of evidence tending to prove, or even infer, that Mr. Bartimo was, or is, actually connected with any criminal element. The allegations linking Mr. Bartimo with the Mafia must be classified as totally false and patently scurrilous. However, under the law, falsity of an assertion concerning a public figure does not establish liability in a defamation action.

After a complete review of the evidence adduced at trial, and the wealth of legal authority on the law of libel, I must conclude as a matter of law that Mr. Bartimo failed to prove by clear and convincing evidence standards that Thomas Russell or the other defendants published the "Outrage!" article with "actual malice." Mr. Bartimo failed to prove that any of the defendants had actual knowledge that the assertions made in the "Outrage!" article were false. Likewise, Mr. Bartimo failed to prove by clear and convincing evidence that Mr. Russell or the other defendants published the "Outrage!" article with "reckless disregard" for the truth or falsity of the assertions made in the article.

In the oral arguments, counsel for Mr. Bartimo attempted to counter the language in the *St. Amant* case by requiring the finder of fact to determine whether the publication was, indeed, made in good faith—for example, that there was no fabrication, no product of the imagination. How do these arguments on subjective good faith apply to Mr. Russell? The question can be formulated in this manner: does a man who intensely dislikes another man and believes him to be a tyrant or a dictator, and who believes the other man to be guilty of outrageous conduct against a

heroic friend, ever be found by the *St. Amant* standard to be in good faith? This is particularly applicable to a man like Tom Russell, who may or may not be engaged in a personal vendetta against a man like Vince Bartimo? I am required to determine the absence of actual malice, not the presence of subjective good°faith.

Mr. Russell testified that he attended two trials in New Orleans concerning race fixing. He said, in addition, that he acquired the depositions from those trials and read them. He said he went to Vermont to check on Mr. Bartimo's previous employment there. He went to the Bossier Parish Court House to check records there. He hired someone to follow Lawrence Solow, a man of questioned reputation who he said was an alleged friend of Mr. Bartimo. He said he interviewed Billy Fox and Irvin Magri Jr., both of whom were connected with the racing trials in New Orleans. He said he talked with various people at the Green Mountain Race Track in Vermont concerning Mr. Bartimo's activities there. He talked to former track employees and to individuals who raced there. He went to the Bennington Banner newspaper office and spent three of four days reading documents having to do with Mr. Bartimo's having been fired from the Green Mountain Race Track.

Mr. Russell said he made a study of the petition in the "sticker" case, and I had to look in the record to find that the sticker case involved cleated shoes on horses for turf races, a controversy where, according to Mr. Russell, all the people who signed the petition were ruled off the track by Mr. Bartimo. He said he interviewed a man named Keith Hortstein, a former reporter with the *Shreveport Journal*; and he said he got a copy of everything that had been in the paper about Vincent Bartimo. He said he interviewed Herb Roberts and Barry Lamonte, both of whom were thrown off the Louisiana Downs track. He said he talked to Mr. Bartimo before he was discharged by Mr. Bartimo, and that later Mr. Bartimo would not talk to him.

Mr. Russell called Orville Henry at the *Arkansas Gazette* about an article on Louisiana Downs which had some allusions to Mafia connections by people who lived in Youngstown, Ohio. [Mr. Bartimo worked for Mr. DeBartolo, who lives in Youngstown, Ohio. *See* Exhibit P–3.] Most important, I think, was that Mr. Russell testified that he relied heavily on that newspaper article that Mr. Henry had written back in 1979. It is clear from Mr. Russell's testimony, and from that of Mr. Bartimo, that Mr. Russell *and* Mr. Bartimo perceived that the Henry article was accusing Mr. Bartimo of being a member of the Mafia. There is in the evidence a pair of letters written by Mr. Bartimo to Mr. Henry, one demanding an apology for the Mafia-related allegations. There is a copy of the article in the paper in Arkansas where a retraction was made of the earlier Henry article. Mr. Russell testified, without any rebuttal, that he called Mr. Henry to discuss the story, and that Mr. Henry did not tell Mr. Russell that the retraction had been published.

There was ample testimony that there was no love lost between Mr. Bartimo and Mr. Russell. I expressly find that, as a fact, Mr. Russell did not like Mr. Bartimo as a result of their prior relationship in the racing business at Louisiana Downs. However, bad blood and bad relations do not constitute bad faith, as contemplated in the *St. Amant* line of cases.

Those cases require proof, by clear and convincing evidence, that defendants possessed a high degree of awareness of the article's falsity or probable falsity. This test is a subjective one. Mr. Bartimo failed to prove to the appropriate degree that Mr. Russell actually had a conscious belief of the probable falsity of the allegations made in the "Outrage!" article. Likewise, Mr. Bartimo has failed to present circumstantial evidence of sufficient weight to allow this court to infer a conscious belief by Russell in the probable falsity of the "Outrage!" article's allegations. In the absence of such a showing, Mr. Bartimo, as a public figure, cannot prevail in his claims based on Mr. Russell's assertions in the "Outrage!" article.

As I stated during argument on the Rule 41(b) motion, I tend to agree with Mr. Justice Fortas in his dissent in the *St. Amant* case—that the First Amendment should not to be a shelter for the character assassinator to further his actions that are heedless and reckless or deliberate. I know that dissenting opinions are not the law, but when I read Justice Stewart's convincing dissent in *Herbert v. Lando, supra,* I found myself nodding affirmatively. These are the words written by Justice Stewart in his *Herbert* dissent:

> Although I joined the Court's opinion in *New York Times,* I have come greatly to regret the use in that opinion of the phrase "actual malice." For the fact of the matter is that "malice" as used in the *New York Times* opinion simply does not mean malice as that word is commonly understood. In common understanding, malice means ill will or hostility, and the most relevant question in determining whether a person's action was motivated by actual malice is to ask "why." As part of the constitutional standard enunciated in the *New York Times* case, however, "actual malice" has nothing to do with hostility or ill will, and the question "why" is totally irrelevant.

99 S.Ct. at 1661.

The gravamen of a lawsuit such as this concerns that which was in fact published. What was *not* published, the author's motive, has nothing to do with the case. Liability ultimately depends upon the publisher's state of knowledge of the falsity of what he published, not at all upon his motivation in publishing it—not at all, in other words, upon actual malice as those words are *ordinarily* understood.

This is not the first time that judges and lawyers have been led astray by the phrase "actual malice" contained in the *New York Times* opinion. In *Greenbelt Cooperative Publishing Association v. Bresler, Md.,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), another defamation suit brought by a public figure against a publisher, the trial judge instructed the jury that the plaintiff could recover if the defendant's publication had been made with malice, and that malice meant "spite, hostility or deliberate intention to harm." In reversing the judgment for the plaintiff, the court said that this jury instruction constituted "error of constitutional magnitude."

Had this case gone to a jury, as it was originally scheduled to do, I would have had to prepare and to give to a jury an instruction couched in the language of *New York Times,* the language of *St. Amant,* and the cases that followed. Otherwise, reversal would have occurred, since it would have been error of constitutional magnitude for me to tell a jury that one can find actual malice in spite, hostility or deliberate intention to harm. Under the testimony in this case, a jury could have found those to have been the motives of Thomas Russell. Even the members of the H.B.P.A. Board stated in its Minutes, "We won't have this magazine become an organ of personal vendetta by Thomas Russell against Louisiana Downs." However, I am reminded that motive of the publisher is not relevant.

In the *St. Amant* case, the Supreme Court set out the law clearly:

> It may be said that [the "reckless disregard"] test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly, the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standards of a reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to assure the ascertainment an publication of the truth about public affairs, it is

essential that the First Amendment protect some erroneous publications as well as true ones.

88 S.Ct. at 1326.

I may fully agree with Mr. Justice Stewart. I may believe the Russell article to be a thoroughly scurrilous attempt at character assassination. I may totally *disbelieve* that there are any Bartimo/Mafia connections. But, while I firmly believe Tom Russell wrote with actual old-fashioned malice in his heart, the current status of the "law of the land" as shown in the compendium of Supreme Court decisions, decisions which I am duty-bound to follow and apply here, requires this trier of fact reluctantly to rule in favor of the defendants. Perhaps Mr. Bartimo will carry the battle to the next level of our court system—and beyond. Maybe someday the law will change to reflect a more palatable standard in libel cases.

For the reasons which I have discussed this afternoon, I find it necessary, under the law and facts adduced in Mr. Bartimo's case-in-chief, to GRANT the defendants' motion for involuntary dismissal pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. It is my opinion that the dismissal of the plaintiff's claims disposes of the cross-claims lodged among the defendants. If this is not the case, I would suggest that motion practice is the appropriate vehicle by which to address any remaining dispute. Therefore, Judgment is ENTERED against Vincent J. Bartimo on his substantive claims against all of the defendants, and in favor of Thomas F. Russell Jr., the Horsemen's Benevolent and Protective Association, *Racing Journal* and Home Insurance Company.

## APPENDIX I

The following stipulated facts were listed in the Pretrial Order submitted by the parties prior to trial:

The publication of the October 1981 issue of the *Racing Journal.*

There has been no retraction to any portion of the article entitled "Outrage!," which appeared in the October 1981 issue of *Racing Journal.*

The article "Outrage!" which appeared in the October 1981 issue of *Racing Journal* was written by Thomas F. Russell Jr.

The policy issued by the Home Insurance Company to the Horsemen's Benevolent and Protective Association provides coverage to the Horsemen's Benevolent Association for the damages allegedly sustained by the plaintiff, Vincent J. Bartimo.

Thomas F. Russell Jr. was not authorized by the Board of Directors of the Horsemen's Credit Union to execute any agreement which the Horsemen's Credit Union would indemnify and hold harmless the Horsemen's Benevolent and Protective Association for any liability which might result from publication of *Racing Journal.*

APPENDIX II

# OUTRAGE!

[seal]

LOUISIANA
STATE RACING COMMISSION
May 13, 1981

ALBERT M. STALL
CHAIRMAN

PATRICK C. McGINTY
SECRETARY

SUITE 1080 ONE SHELL SQUARE
701 POYDRAS STREET
NEW ORLEANS, LOUISIANA 70139

Owner Trainer, William I. Fox
License # JD15070
4021 Lemon Street
Metarie, La. 70002

Dear Mr. Fox:

You are hereby directed to appear before a board of Stewards at
Louisiana Downs, on May 20, 1981, at 10:00 A.M. to answer questions
regarding allegations made by you concerning the qualifications of
the Stewards during open testimony in civil district court, parish
of Orleans, in the trial of Daniel E. Coates VS Fairgrounds Corpor-
ation and Irwin Magri, Jr., consolidated with Laurence Solo VS
Fairgrounds Corporation and Irwin Magri, Jr.

You are entitled to legal representation if you so desire and  it
will be your responsibility to notify your representative  of the
time and date.

RICHARD M. HOBAN,
State Steward

Vincent Bartimo, the General Manager of Louisiana Downs, has done what no other man in the United States has ever done. He called a Stewards Hearing, then suspended from racing a man for giving sworn testimony before a jury about an attempt to fix a race. It is an outrage.

Probably no other act has ever outraged the sense of justice of horsemen, and certainly no other single event has so unified the horsemen of the United States. States of Louisiana, Kentucky and Illinois have already seen their H.B.P.A. act in consort and condemn Bartimo and his Stewards for

their action. This is the first true story concerning Fox and alleged Mafia Lieutenant Vincent Bartimo. (Ed's Note: In a copyrighted article in the Arkansas Gazette Orville Henry disclosed that Bartimo was a Lieutenant in the army of DeBartolo.)

Billy Fox is not the kind of guy that figured to become a hero. On the contrary, to those who have met him for the first time he is a diminutive, black haired individual with a rather impish smile. His looks would belie the fact that he has been married 19 years with four children. Those who know him, however, realize that despite his youngish looks, he has been married to Patsy since they met at Saratoga where he claims she was there for the express purpose of meeting and marrying a leading jockey (which Billy was when he worked for Darby Dan Farm).

They have followed the race track through the years, raising their family while handling some of the best horses that have raced in Louisiana and adjoining states. His proudest moments concern the family. One little story tells the true story. Racetrackers raise their families around horses and Bill has been no exception. This year, one of his dreams culminated when their youngest daughter was approved to ride in an accredited race in Kentucky. They had worked for this moment for years—together, family, Mother, Dad and Tammy. When they went to the paddock Bill was trying to be calm, instructing his daughter in the manner in which to ride. "Stay cool, be calm, just because it's your first race don't get excited, stay collected." He heard the call, "Jockeys up," and promptly threw Tammy over the horse!

But there is and always has been a serious side to Billy Fox. He has fought for the horsemen and the integrity of the Sport of Kings. When he offered to serve the H.B.P.A., his election was tantamount when his name appeared because the horsemen have an unfailing trust in his integrity and honesty. He has never failed them and it was in this spirit that the latest episode of Billy Fox's life began.

Here, for the first time made public, is the sworn testimony (insignificant testimony has been omitted) of Billy Fox before the jury on April 1, 1981, in the case of Laurence Solow versus Fair Grounds Corporation and Irwin Magri, Jr. To summarize the case, Fair Grounds Corporation had barred or attempted to bar two individuals indicating they were known bookmakers and alleged fixers of races. One of the individuals was a man named Larry (Laurence) Solow. Solow was alleged to have been involved in the fixed Bye Gem race. Quoted here is the pertinent testimony Billy Fox gave in sworn testimony before the jury.

The cast of characters in this senario are Laurence (Larry) Solow, an alleged fixer and bookmaker; Lawrence Ribodeaux, trainer for Vincent Bartimo; and Vincent Bartimo, President of Louisiana Downs and unaffectionately called "Snake" before he was fired as General Manager of Green Mountain Race Track in Bennington, Vermont; Mr. Brenner, Attorney for Solow; Mr. Roussel, Attorney for Fair Grounds, Inc.

**The Witness: (Billy Fox)**

On August the 27th, I had two horses entered in the first race at Louisiana Downs.

**The Court:**

What year?

**The Witness:**

1980.

**The Court:**

Okay.

**The Witness:**

On August the 26th, the night of August the 26th, Mr. Solow called my home and said, "I understand you have two horses that can both run in the first race." I said, "Yeah, I think they can both run." He said, "We have a chance to make a lot of money here." He said, "Mr. Robideaux's horse will be the favorite. I can kill him. All you have to do is tell me which one of your horses you'll let run and we'll be able to make a lot of money." I said, "Well, I don't do that. I

never had. And both of my horses can run and get whatever they can." He said, "Well, if you change your mind call me at the hotel at ten o'clock the next morning." I said, "I won't be calling you."

. . . . .

## CROSS–EXAMINATION

**By Mr. Brenner:**

**Q.** *You mean you didn't report an attempt to influence you because the head investigator wasn't there?*

**A.** That's exactly right, and I'll tell you the reason why, because the other man I could have reported was Vincent Bartimo, and I've seen him with Mr. Solow frequently.

. . . . .

**Q.** *No. Now, this man you say you didn't want to report to because nothing would have come of it—*

**A.** Vincent Bartimo.

**Q.** *And exactly what is his function?*

**A.** General Manager of the race track, Louisiana Downs.

**Q.** *Tell us again the reason you wouldn't report it to him.*

**A.** Because I've seen Mr. Solow and Mr. Bartimo on numerous occasions having lunch in the Club House, and he's a good friend of his, evidently.

. . . . .

**Q.** *Now, at Louisiana Downs there are three Stewards, are there not?*

**A.** Yes, sir.

**Q.** *Could you tell us why you didn't report it to the Stewards?*

**A.** Well, you kind of have to be up at Louisiana Downs to know what goes on.

**Q.** *Well, sir, you tell us please.*

**A.** Vincent Bartimo runs everything. He tells how many rolls of toilet paper to buy on up to running the restaurant, and he hires the stewards, the other two stewards, and he has complete control of everything that goes on there.

**Q.** *Well, isn't there one steward who's appointed by the State?*

**A.** He's the one that got the job appointed by Gus Majolis that had never seen a race track before in his life, and he got the job because he was a friend of Gus Majolis.

**Q.** *What does it matter he hadn't seen a race track before? Can you tell us why it matters because he hadn't seen a race track before?*

**A.** In other words, he's not qualified to be a steward. He got a job because Gus Majolis appointed him, and Gus Majolis and Vincent Bartimo are extremely close.

. . . . .

**Q.** *The fellow you're talking about who's not qualified to be a steward.*

**A.** General Hoban, H–O–B–A–N.

**Q.** *You say General?*

**A.** Yes, sir.

**Q.** *He's a former general in the Air Force, is he?*

**A.** He was a general in the Air Force in charge in buying the food for the Air Force base, and he bought the fish from Gus Majolis while he was working— while he was in the Air Force, and that's his connection with Gus Majolis.

**Q.** *Do you have any reason to think General Hoban or Mr. Majolis or anyone else would not have acted on your complaint if you told them what you just told the Court?*

**A.** Yes, sir.

**Q.** *What is that reason?*

**A.** I just told you because Larry Solow and Vincent Bartimo evidently are very close friends. I see them together on numerous occasions, and Vince controls everything at Louisiana Downs."

When Louisiana Downs' President heard about this he barred Fox from saddling, training, entering or racing horses at the track. There was some rumor that the reason Fox was barred was because he had participated in the petition concerning the "Sticker Case," but the truth was that "Snake" had decided that he would teach Fox a lesson. Bartimo, with a stockholders' meeting out of the way (where his alleged Mafia connections and partnership with convicted felon Charles E. Roamer II were exposed) the previous day, had the Stewards write two letters—one to Fox

demanding that he appear before the Stewards. The other letter was to bring before the Stewards the man who charged Bartimo with being alleged Mafia and of being a partner with a man convicted in the Brilab Scam in New Orleans along with Carlos Marcello, referred to as the Godfather of the Southern Mafia.

On May 13th (the day after his stockholders' meeting), Fox was written the letter printed at the beginning of this article. Outrageously, Bartimo ordered the Stewards to hold a hearing concerning allegations made by Fox in sworn testimony before a jury.

In an interview Fox stated that he received the letter in Kentucky but he had already had wind of what was going on. "I had information that Bartimo had called a meeting of four or five people and had given the instructions what to do." Interestingly enough, present at the meeting along with State Steward Richard Hoban, was Security Chief Frank Pernici among others. When they came up with the idea of a Stewards Hearing, Hoban objected, claiming, "You can't do that, Fox has a right to his opinion." Hoban was instructed to call the meeting and rule him off, period, and that's what happened.

On June 13, 1981, the Daily Racing Form printed the official ruling from Louisiana Downs Stewards:

### OFFICIAL RULINGS

#### Louisiana Downs

*"Owner-Trainer, William L. Fox, license JD 15070, is suspended for the remainder of the meet plus 10 days and referred to the Louisiana State Racing Commission with the recommendation that his suspension be continued for whatever time deemed appropriate. Mr. Fox was found to be in violation of LAC 11-6-2. (General rules, par. 2.4 and par. 2.6). All horses owned in whole or in part by him, or under his care or supervision, shall be ineligible to be entered or to start unless transferred by a bona fide sale or lease to a person in good standing and approved by the stewards. During suspension, he is denied access to the grounds of all racetracks under the supervision of the Louisiana State Racing Commission."*

And, of course, Bartimo had it published on his machine and sent out over the wire not only to The Racing Form but to his newspapers, The Times and Journal in Shreveport. (Ed's Note: This favorable publicity comes from Bartimo's habit of playing to the press. He hired the sport's editor of the Bennington Banner to be Racing Secretary at Green Mountain Race Track and he has followed the policy at Louisiana Downs. Former journalist Bob Forrest of the Shreveport Journal was hired by Bartimo in order to get favorable publicity. It is also rumored the Shreveport Times sports reporter Bill McEntyre has made a deal to go to work for Bartimo after retirement [McEntyre was unavailable for comment]. If Bartimo can't get favorable reporting, he goes after the job of the reporter as he did to Keith Hartstein of the Shreveport Journal. Bartimo prevailed on owner-breeder, Fasig-Tipton Director Susan McCormick, daughter of the owner of the Shreveport Journal, to fire Hartstein after he had written several articles critical of Louisiana Downs.)

Fox feels that the net result of this outrageous ruling was the loss of 18 horses that he had previously been training that were going to Louisiana Downs. "A couple of owners called Bartimo to get stalls for me at the time and he told them if they would change trainers he'd give them stalls and they did." (Ed's note: This is an old Bartimo trick since the days of Green Mountain from which he was fired according to court documents furnished this author. In Case No. C43-74BC, State of Vermont, the Rooney interests (owners of Green Mountain Race Track) alleged that under Bartimo's direction "certain income of Green Mountain was received but not entered on the books" and alleged "that there may have been wrongful disbursement of funds." On December 21, 1977, the Rooneys amended their petition by stating "they were informed and believe and therefore allege that Bartimo negligently failed to exercise a proper degree of business acumen in the performance of his

duties, was negligent in the same, failed to carry out his duties in a proper business like fashion, thus resulting in substantial loss to said Green Mountain Racing Corporation." Bartimo has used similar tactics against black trainers Daria Lamonte and Herb Roberts for which they are presently bringing suit.)

Fox has been damaged and he is filing suit over the suspension. The new Racing Commission has an opportunity to set this matter straight, but it's rumored that Bartimo has three men on the Racing Commission including one Stockholder of Louisiana Downs and one business partner of an associate of the "Snake". Bartimo has already commented that he will own the new Racing Commission just like he did the last one.

Fox is concerned, not just about himself, but he is worried that unless that dictatorial policy of the alleged Mafia boss Bartimo is halted the plight of the horsemen in Louisiana will get worse. If horsemen are suspended for giving information to a jury about a fixed race, what is next? Can a horseman have an opinion, or will he be silenced? Are the horsemen willing to be crushed like ants as Bartimo has threatened? How much longer will he be able to run roughshod over the horsemen?

The Mafia has long been known for their ability to "hit" anyone, usually by gang slayings. If Bartimo gets away with this attempt on "Billy Fox" his next hit could be you.

*(This is the first part of an interview with Bill Fox. The second part will be in the next issue.)*