Vincent J. BARTIMO,
Plaintiff-Appellant,

v.

HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, Horsemen's Credit Union, Thomas F. Russell, Jr., and the Racing Journal, Defendants-Appellees.

No. 84–4550.

United States Court of Appeals,
Fifth Circuit.

Sept. 23, 1985.

Pugh & Pugh, Robert G. Pugh, Jr., Robert G. Pugh, Shreveport, La., for plaintiff-appellant.

Cook, Yancey, King & Galloway, Herschel E. Richard, Jr., John D. Collinsworth, Shreveport, La., for Horsemen's Benev. & Protective Assn.

Broadhurst, Brook, Mangham, Hardy & Reed, Charles R. Minyard, Lafayette, La., for Union, The Racing Journal and Thomas F. Russell, Jr.

Before RANDALL, DAVIS, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

In an action for defamation under Louisiana law the district court in a nonjury trial granted defendant's motion for involuntary dismissal, Fed.R.Civ.P. 41(b), after plaintiff rested, on the ground that plaintiff had failed to show actual malice as required by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *Bartimo v. Horsemen's Benevolent and Protective Association*, 592 F.Supp. 1526 (W.D.La.1984). Because we agree that plaintiff failed to carry the heavy burden imposed upon him by *Sullivan*, we affirm.

I.

In the spring of 1981, defendant Thomas F. Russell, Jr., was a member of the Louisiana Division of the Horsemen's Benevolent and Protective Association (HBPA), a national organization dedicated to the advancement of the interests of racehorse owners, breeders, trainers and others connected with the horse racing business. Plaintiff Vincent J. Bartimo was then President and General Manager of Louisiana Downs Racetrack in Bossier City, Louisiana. That spring Russell and other members of the HBPA, including most of its

board of directors, instituted a new publication intended to cure what the local HBPA perceived as shortcomings in the national HBPA publication. Russell volunteered to edit, publish and distribute the new publication, the *Racing Journal*, with the sponsorship of the HBPA.

The first issue of the new publication, which appeared in October 1981, contained an article entitled "Outrage!", written by Russell. The article described Bartimo's role in the suspension of owner-trainer William I. Fox from racing privileges at Louisiana Downs. The thrust of the article was that Bartimo initiated the disciplinary action in retaliation for Fox's testimony in a trial involving the fixing of certain horse races in New Orleans. Russell's article posited as Bartimo's motive "alleged mafia connections" between him and those accused of fixing the races. More specifically, Russell's article: (1) referred to Bartimo as "alleged Mafia Lieutenant Vincent Bartimo," and "alleged Mafia boss Bartimo"; (2) claimed that Bartimo was "unaffectionately called 'Snake'" in his previous employment in Vermont; (3) alleged that Bartimo had a "partnership with convicted felon Charles E. Roamer II"; (4) charged that Bartimo had stated he would "own the new Racing Commission just like he did the last one"; and (5) stated that Bartimo had threatened to "crush" certain horsemen "like ants." Russell concluded the article with the following charges: "The Mafia has long been known for their ability to 'hit' anyone, usually by gang slayings. If Bartimo gets away with this attempt on 'Billy Fox' his next hit could be—you."

Bartimo then brought this action for defamation against Russell, the HBPA, and the HBPA's insurer, Home Insurance Company.[1] Louisiana law requires that a plaintiff show the following elements in order to be entitled to recovery: (1) publication; (2) falsity; (3) malice, actual or implied; and

(4) resulting injury. *Manale v. City of New Orleans*, 673 F.2d 122, 125 (5th Cir. 1982). *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), heightens the required showing on state of mind to the level of "actual malice" where the allegedly defamatory statements are made about a "public official." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162, 87 S.Ct. 1975, 1995, 18 L.Ed.2d 1094 (1967), extended the *Sullivan* rule to "public figures." After Bartimo rested his case, the district court dismissed under Rule 41(b) on the ground that he had failed to present evidence sufficient to support a finding of actual malice under *Sullivan*. The court first found, however, that the defendants had "published" the "Outrage!" article and that the statements about Bartimo in the article were false. 592 F.Supp. at 1530. The court did not reach the issue of resulting injury. *Id.* Bartimo appeals claiming only that he did indeed sufficiently establish actual malice.

## II.

In *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, ——, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502, 526 (1984), we were instructed that appellate courts must exercise independent judgment when reviewing "determination[s] of actual malice in ... case[s] governed by *New York Times v. Sullivan*." (footnote omitted). Thus, the clearly erroneous standard of Fed.R.Civ.P. 52(a) is set aside in order to safeguard the First Amendment values threatened by a finding that speech caused compensable harm. As the Court stated in *Bose*:

> The requirement of independent appellate review reiterated in *New York Times v. Sullivan* is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is

---

**1.** The HBPA and its insurer Home Insurance Co., also a defendant, cross-claimed against Russell claiming he was solely responsible for the article. Russell cross-claimed against the HBPA and the insurance company for defense and indemnity.

Bartimo also named the Horsemen's Credit Union as a party defendant but summary judgment was granted in its favor prior to trial. There is no appeal from this ruling.

law in its purest form under our common law heritage. It reflects a deeply held conviction that judges—and particularly members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

466 U.S. at ——, 104 S.Ct. at 1965, 80 L.Ed.2d at 523. As regards the review of actual malice determinations, the Court stated the rule of independent review in terms broad, clear and without exception.

█ Nevertheless, Russell contends that the appropriate standard is that supplied by Rule 52(a) since the rationale underlying the *Bose* rule of independent review does not obtain in this case. That is, the argument continues, the district court's finding of no actual malice and its dismissal of the plaintiff's defamation claim presents no threat to the First Amendment values defended by Russell and the HBPA. Therefore, Russell concludes, the district court's judgment should be subjected only to the less exacting clearly erroneous standard. We reject the argument.

First, it is not clear to us that the rationale of *Bose* is inapplicable here, for definition of First Amendment protections requires inclusion as well as exclusion and the former is no less a judicial function merely because it does not pose a direct threat to First Amendment values. Including speech within the protected category requires no less careful an evaluation of constitutionally significant facts than ex-

cluding such speech. *Cf. Bose*, 466 U.S. at ——, 104 S.Ct. at 1961, 80 L.Ed.2d at 519. In addition, Russell's argument fails to account for the Supreme Court's broad language in *Bose*, which purported to make no distinction whatever between cases in which judgment was in favor of the alleged defamer and those in which judgment was in favor of the alleged defamed. We think if the Court had intended to make such a distinction it would have so limited its holding. The notion that such evaluations fall within the peculiar province of the judicial function is critical to the rule of *Bose*.

Moreover, prior to *Bose* the Supreme Court has, under the authority of *Sullivan*, engaged in independent review of a trial court's finding of no actual malice. In *Associated Press v. Walker*, 388 U.S. at 140–42, 87 S.Ct. at 1983–84, the companion case to *Curtis Publishing Co. v. Butts*, the trial court had granted judgment notwithstanding a jury verdict for punitive damages on the ground that the evidence supported a finding of no more than ordinary negligence on the defendant's part. *Id.* Both the Court of Appeals and the Supreme Court affirmed, the latter undertaking "to face for [them]selves the question whether there is sufficient evidence to support the finding" of actual malice. *Id.* at 158, 87 S.Ct. at 1993.[2]

Finally, no court of appeals has recognized the distinction for which Russell contends. *Cf. Levine v. CMP Publications, Inc.*, 738 F.2d 660, 672–73 n. 19 (5th Cir. 1984) (*Bose* standard inapplicable to review of jury's finding that statements were false), *reh'g denied*, 753 F.2d 1341 (1985). On the contrary, the Tenth Circuit has, albeit without discussing the argument Russell advances here, undertaken independent review of a district court's judgment for defendants on the ground that no actual malice was demonstrated. *Hardin v. Santa Fe Reporter, Inc.*, 745 F.2d 1323, 1326 (10th Cir.1984). Most recently, the

---

**2.** The Court thus declined to follow the concurrent findings standard of review by which the Court "cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error." *Grover Tank & Mfg. Co. v. Linde Air Prod. Co.*, 336 U.S. 271, 275, 69 S.Ct. 535, 538, 93 L.Ed. 672 (1949).

D.C. Circuit has done likewise in reviewing a district court's judgment n.o.v. in favor of defendants on the ground that actual malice was not sufficiently demonstrated. *Tavoulareas v. Piro*, 759 F.2d 90, 107 (D.C. Cir.1985). We follow the lead of *Hardin* and *Tavoulareas* for the reasons expressed above and because we cannot see the sense of applying "a rule of federal constitutional law," *Bose*, 466 U.S. at ——, 104 S.Ct. at 1965, 80 L.Ed.2d at 523, only if the plaintiff prevails at trial.[3]

We therefore undertake independently to review the entire record in order to determine whether the district court properly concluded that Bartimo failed to demonstrate actual malice. We limit this level of scrutiny, however, to the ultimate factual finding of the constitutionally mandated actual malice element. For the reasons stated in *Tavoulareas*, we decline to undertake to review the credibility findings of the district court and the subsidiary factual findings supporting the ultimate determination regarding actual malice. *See* 759 F.2d at 107–09. We think, as the *Tavoulareas* court did, that this limitation is at least implicit in *Bose* and mandated by considerations of economy, the nature of appellate review and the advantageous position of the fact finder to make such decisions. *Id.*

### III.

The actual malice test of *Sullivan* "requires a plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose*, 466 U.S. at ——, 104 S.Ct. at 1965 n. 30, 80 L.Ed.2d at 525 n. 30. The latter prong of the test is merely an interpreta-

tion of the standard stated in *Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26, as "with reckless disregard of whether it was false or not." *Gertz v. Welch*, 418 U.S. 323, 334 n. 6, 94 S.Ct. 2997, 3004 n. 6, 41 L.Ed.2d 789 (1974); *see also Brewer v. Memphis Publishing Co.*, 626 F.2d 1238, 1258 (5th Cir.1980) (must show "a high degree of awareness ... of the article's falsity or probable falsity.").

■ Moreover, as the district court so ably explained, *Bartimo*, 592 F.Supp. at 1529, 1532, there is a distinction between the ordinary understanding of actual malice in the sense of ill-will and the *Sullivan* understanding of it in the sense of knowledge or reckless disregard of falsity. *See Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248 (1967). Liability turns not on the extent of the hatred, hostility, spite or intention to harm that defendant bears for plaintiff, but on his subjective evaluation of the accuracy of the statements he publishes to serve his motives. *See Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6, 10–11, 90 S.Ct. 1537, 1539–40, 26 L.Ed.2d 6 (1970); *see also Garrison v. Louisiana*, 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964).

■ The reckless disregard standard is, by nature, susceptible only of case-by-case definition and clarification. *St. Amant v. Thompson*, 390 U.S. 727, 730–31, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). It is clear enough, nonetheless, that a failure to investigate is not sufficient in itself to establish reckless disregard. *Id.* at 733, 88 S.Ct. at 1326. Thus, "reckless conduct is not measured by whether a reasonably prudent [person] would have published, or

---

**3.** Russell's argument would introduce the possibility of a particular record being reviewed by two different standards as it made its way through the appellate process. If, for instance, we were to accept Russell's position and find the district court's judgment to be clearly erroneous because actual malice was shown, the Supreme Court, were it to grant review, would be compelled to review the record independently as it did a reversal by the Seventh Circuit in *Time, Inc. v. Pape*, 401 U.S. 279, 284, 91 S.Ct.

633, 636, 28 L.Ed.2d 45 (1971), a precursor of *Bose*. Unhappily, the Seventh Circuit did not identify the standard by which it reviewed the district court's summary judgment in favor of defendants on the ground actual malice had not been shown. *See Pape v. Time, Inc.*, 354 F.2d 558, 560–61 (7th Cir.1965). We think judicial economy is best served by requiring the same standard of review at all levels, regardless of the outcome below.

would have investigated before publishing" but by whether a particular defendant *"in fact* entertained serious doubts as to the truth of [the] publication." *Id.* at 731, 88 S.Ct. at 1325 (emphasis added). This the plaintiff must demonstrate clearly and convincingly.

By the same token, however, a defendant cannot ... automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

Id. at 732, 88 S.Ct. at 1326 (footnote omitted).

## IV.

■ Turning to the statements about which Bartimo complains, no evidence whatsoever was introduced regarding Russell's belief that Bartimo made the "ants" statement. Bartimo clearly failed to carry his burden of proving actual malice connected with that statement. Similarly, concerning the nickname "Snake," Russell testified that three different persons had informed him of the prevalence of the epithet as applied to Bartimo. The only rebuttal was Bartimo's own testimony that he had never heard himself referred to in that manner. This testimony, of course, had only remote and indirect relevance, if any, to Russell's belief that Bartimo was called "Snake." The evidence thus clearly failed to support even an inference of actual malice connected with the nickname. Regarding the charge of a partnership with "con-

victed felon Charles E. Roamer II," Russell testified without contradiction both that Bartimo had at one time owned land jointly with Roamer and that Roamer had been convicted of a felony. Even Bartimo did not testify otherwise. There was thus no evidence, direct or circumstantial, that Russell doubted the accuracy of this statement.

There was something more of a contradiction regarding the statement about "own[ing] the new Racing Commission." Bartimo denied having made such a statement. The only testimony elicited from Russell concerning Bartimo's influence with the Racing Commission was to the effect that Russell did in fact have the opinion that Bartimo "owns" three men on the Commission, this in reference to a sentence in the "Outrage!" article to that effect. In addition, Russell testified that Bartimo had said to Russell that the upcoming gubernatorial election would have no effect on Louisiana Downs because he (Bartimo) would own the new governor just as he had the prior or present one. Russell was never asked whether Bartimo had actually said he would own the Commission. Clearly then, Bartimo failed to demonstrate that Russell doubted the accuracy of this statement.

■ The trial and the arguments of counsel below and on appeal focused almost exclusively on Russell's references to Bartimo's alleged ties with the Mafia. At the outset we note that each reference is prefaced by the word "alleged." There is thus the threshold problem of interpreting—or misinterpreting—what Russell intended to say. While the story in its entirety may appear to assert the truth of Bartimo's Mafia ties, it carefully avoids doing so explicitly by using the word "alleged." In our view the "Outrage!" article's reference to Bartimo and the Mafia can be read as no more than a report that Bartimo has, at sometime or other, been allegedly connected with the Mafia.

Russell's only source for the Mafia allegations was an article in the June 14, 1979, issue of the Arkansas Gazette written by Orville Henry. In the first paragraph of

the "Outrage!" article Russell refers explicitly to Henry's article. The relevant portion of the Henry article referred to Bartimo's then employer Edward DeBartolo[4] and stated: "DeBartolo comes from Youngstown, Ohio, a Mafia stronghold and his top lieutenants are Bartimo and Joe Aiello. 'Ciaio' [sic] was a frequently heard greeting at Wednesday's lavish Louisiana luncheon." The Mafia reference was retracted about a week later by Henry in response to an indignant letter from Bartimo. In November 1980, when Russell began the research for the "Outrage!" article, Russell was already familiar with Henry's article. Subsequently, when Russell called Henry to verify the story sometime in 1981, Henry neither mentioned the retraction nor told Russell that Bartimo was in the Mafia. Nor did Russell ask Henry if there had been a retraction of or apology for the article.[5]

Bartimo first argues that actual malice was shown since the Henry article cannot be read as an allegation that Bartimo was connected with the Mafia and that therefore Russell's statements were fabrications. *See St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326. We disagree. We think the relevant portion of the article quite susceptible of the interpretation Russell placed upon it. Indeed, Bartimo revealed in his response letter to Henry that he himself interpreted the article as a "declaration that I am a member of the Mafia." Bartimo now argues that Russell could not have so interpreted the article but we think it clear that he could have and, indeed, was quite reasonable in doing so.

Our holding is buttressed by that in *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1970). There Time magazine failed to use such words "alleged" or "allegation" in its description of certain incidents involving alleged police brutality. The descriptions were drawn from those in a report by the United States Commission on Civil Rights. The Commission's report was itself "extravagantly ambiguous" in indicating whether or not the Commission believed that the incidents described were true or merely accounts of allegations in pleadings filed in those cases. Despite Time's failure to use words such as "alleged" or "allegation" the Court held that the evidence was not sufficient to create a jury issue under *Sullivan* since Time's was "one of a number of possible rational interpretations of a document that bristled with ambiguities." *Id.* at 290, 91 S.Ct. at 639.

Henry's article was no less ambiguous with regard to whether it actually was alleging a connection between Bartimo and the Mafia and Russell's interpretation was no less reasonable than Time's. Bartimo's reading of the evidence, assuming as it does a narrow and selective interpretation of the Henry article, is not sufficient to compel an inference that Russell fabricated the Mafia allegation. Russell's conduct reflected, at most, an error in judgment. *Time, Inc. v. Pape,* 401 U.S. at 292, 91 S.Ct. at 640.

Finally, Bartimo argues that Russell's investigation for the "Outrage!" article was grossly inadequate in the circumstances. Where investigation for a story that is not "hot news" is grossly inadequate in the circumstances, actual malice may be inferred from the publisher's failings as an investigator. *Vandenburg v. Newsweek, Inc.,* 441 F.2d 378, 380 (5th Cir.1971) (citing *Curtis Publishing Co. v. Butts,* 388 U.S. at 156–58, 87 S.Ct. at 1992–93). Bartimo goes on to argue that Russell should be required to buttress his story with more than the ambiguous Henry article and to verify the Henry article with more than the ambiguous telephone call to Henry.

Much of Bartimo's argument, however, assumes away Russell's use of the word

---

4. Bartimo began his association with DeBartolo in 1975 and continued in his employ until his tenure at Louisiana Downs ended in early 1982.

5. Exactly what transpired in the conversation does not appear in the record but Russell's counsel stated at oral argument that, upon being asked about the article, Henry said, "Forget about it," and hung up the telephone. Counsel for Bartimo did not contradict this.

"alleged" with each mention of Bartimo and the Mafia. Had Russell's article actually purported to accuse Bartimo of having Mafia connections, we would be more receptive to Bartimo's argument. As we have already observed, however, Russell's careful use of allegation language removes this interpretation from the realm of possibility. Given the equivocal nature of the information the "Outrage!" article conveyed, that is, that Bartimo *allegedly* had ties to the Mafia, Russell's investigation was adequate. Again, as we have already noted, the Henry article can reasonably be read as an allegation that Bartimo was a Mafia lieutenant in DeBartolo's army. In addition Russell, in his testimony, made an admittedly obscure reference to other indirect sources for the allegation, to "information [to that effect] getting around." Counsel for Bartimo did not, however, follow up with questioning on the precise identity of these word-of-mouth sources. Thus, it is clear Russell had sources for his charge that Bartimo was an *"alleged"* Mafia figure. We therefore hold that while Russell might have done more to substantiate his report of the accusations, his investigation was adequate in the circumstances.

It might be asked whether Bartimo could have done more to carry his burden or if the case ended when Russell testified under oath that he believed what he wrote. The answer to the first question can only be that more could have been done. For instance, Russell's state of mind as to some of the statements was not examined. Also, the telephone call Russell made to Henry was not testified to in detail. It may be that the obscureness of the record is due solely to the procedural disposition of the case. It may be that Bartimo brought out all the testimony in his favor when he had the opportunity and that there simply was not more evidence to adduce. In any event, it is clear to us that our holding leaves ample room for future plaintiffs to maneuver successfully within the *Sullivan* framework. The answer to the second question must therefore be the same "no" as that given by the Court in *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326. The case ended not when Russell testified to his own good faith but when Bartimo failed to show that Russell subjectively doubted or recklessly disregarded the truth of his statements.

Russell admittedly engaged in hyperbole and displayed bad judgment, for instance by calling Bartimo a "Mafia *Boss* " and by referring to "gang slayings" and "hits" in the final paragraph of "Outrage!" The title itself illustrates the point as well. The district court found the statements to be false. Nonetheless, the First Amendment, as explicated in *Sullivan* and its progeny, instructs us that the law of libel cannot purport to punish the defamer or compensate the defamed when the allegedly libelous statements are merely false or the product of literary license. See *Sullivan*, 376 U.S. at 279, 84 S.Ct. at 725; *Time, Inc. v. Pape*, 401 U.S. at 290–92, 91 S.Ct. at 639–40; *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *Bose*, 466 U.S. at ——, 104 S.Ct. at 1966, 80 L.Ed.2d at 525. As the Court said in *Sullivan*, "erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive'." 376 U.S. at 271–72, 84 S.Ct. at 721 (citations omitted). The actual malice standard is the instrument with which the courts have struggled to carve out this breathing space in a complex and litigation-saturated culture. The district court's dismissal of Bartimo's action as to Russell is its affirmation, however reluctant, *see Bartimo*, 592 F.Supp. at 1533, of its necessary role in this struggle.

V.

Having held that Bartimo failed to demonstrate actual malice on the part of Russell, the district court considered it unnecessary to determine whether the HBPA could be vicariously liable under a respondeat superior theory or otherwise. Similarly, our resolution of the appeal in favor of Russell renders it unnecessary for us to

consider the parties' arguments regarding imputation of Russell's fault to the HBPA.

The district court also found that Bartimo failed to demonstrate actual malice on the part of the HBPA. We agree. The only evidence even approaching evidence of the HBPA's actual malice was testimony to the effect that two members of a committee of the HBPA's board of directors appointed to oversee publication of the Racing Journal read the "Outrage!" article prior to its publication. Russell testified that a third member of the four-person committee "saw" the article. Only one committee member, however, knew it was to be published. There was also evidence that the article was "available" to the members of the board of directors of the HBPA, but no evidence that any of the remainder of the directors read it. There was no testimony regarding any board member's belief in the truth of the statements made in the article. One board member even cautioned Russell, prior to publication of October 1981 issue, against using the journal to support a "personal vendetta" against Louisiana Downs.

Since a mere failure to investigate the factual basis of the article by the one committee member who knew the article was to be published could not alone support a finding of actual malice, *St. Amant*, 390 U.S. at 733, 88 S.Ct. at 1326, it is clear Bartimo failed to carry his burden of showing actual malice on the part of the HBPA. The only real connections between the HBPA and the article were the HBPA's partial financial support of the journal as a whole and its encouragement of Russell and cooperation with him in aspects of the enterprise other than the "Outrage!" article itself. While such connections would lend support to a theory of imputed fault, they have no bearing on the HBPA's actual malice as defined by *Sullivan*. The district court was therefore correct in finding in favor of the HBPA.

The judgment is AFFIRMED.