James Patrick **PRICE**

v.

Thomas H. **BRITTAIN**, Jr., C. Murray **Henderson**, Roger **Guissinger**, and Rahn **Sherman**.

Civ. A. No. 82–558–A.

United States District Court, M.D. Louisiana.

April 6, 1988.

Brooks E. Hester, James C. Ferguson, Baton Rouge, La., for plaintiff.

Fernin F. Eaton, Dept. of Health & Human Resources, Office of General Counsel, Baton Rouge, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

Findings of Fact

1. From June 1, 1981, until his termination on September 15, 1982, plaintiff James Patrick Price was employed as a social worker at the Feliciana Forensic Facility, a state [1] mental health facility which houses involuntarily committed patients: those found not guilty of a criminal offense by reason of insanity, those found mentally incompetent to assist in the defense of criminal charges, those transferred from state penal facilities and those transferred from other state hospitals because of behavior problems. Plaintiff was a tenured employee.

2. By letter dated November 2, 1981, plaintiff was reprimanded by Artis Cox, Forensic Psychiatric Program Administrator, for failing to follow agency regulations regarding release of information and for failing to inform the "appropriate persons" in the "chain of command." The information at issue concerned a staff member trading drugs for sexual intercourse with a female patient (the "Talarsky incident"). Plaintiff was specifically cautioned against releasing such information to the state police rather than having the Facility Administration Offices release the information through Department of Health & Human Resources channels. The written reprimand stated in part:

> The incident I refer to was the release of information regarding the Kathy Talarsky case to State Police on Tuesday, October 21, 1981.
>
> As you know, Department of Health & Human Recourses Regulations are that no employees are to release information individually, but rather that the information must be released to the Department of Heath & Human Resources Public Relations Office by the Facility Administrative Offices.

3. On the morning of June 25, 1982, defendant Murray Henderson, the Chief Executive Officer at Feliciana Forensic Facility suspended plaintiff without pay. Plaintiff was not granted any type of hearing prior to the suspension. Later that day, defendant Thomas Brittain, the Assistant Secretary of the Office of Mental Health and Substance Abuse, rescinded Henderson's suspension order. Brittain was concerned about the legality of Henderson's action in view of the fact that allegations being made by plaintiff concerned Henderson. Those allegations concerned, inter alia, a charge that Henderson and other staff members had conspired to cause a patient's murder and that Henderson and other staff members were involved in selling illegal drugs in the institution. Plaintiff also had publically claimed that he was working "undercover" for various law enforcement agencies, including the state police and the F.B.I. Brittain reviewed all of plaintiff's claims, as well as Henderson's reasons for suspending plaintiff. Plaintiff was given a full opportunity to present his charges and to explain Henderson's charges. It is undisputed that Brittain refused to allow plaintiff's lawyer to attend the meeting. At the conclusion of the meeting, Brittain suspended plaintiff without pay pending further investigation.

4. By letter dated July 8, 1982, Brittain confirmed his verbal suspension of plaintiff "from duty and pay" effective June 28, 1982, for an indefinite period of time not to exceed ninety days. The letter additionally notified plaintiff of his right to appeal to the State Civil Service Commission and the reasons for his suspension. Essentially the reasons included the following:

(A) breach of patient's trust by discussing the confidential comments by patients with other patients and spreading

---

**1.** The Feliciana Forensic Facility is an agency of the Office of Mental Health and Substance Abuse within the Louisiana Department of Health and Human Resources.

"unfounded rumors and allegations concerning staff and patients alike;"

(B) encouraging or soliciting patients to hire Brooks Hester (an attorney that had formally been a social worker at Feliciana Forensic Facility) to represent them in lawsuits;

(C) spreading unfounded rumors to employees and patients that two patients and Henderson had conspired to murder a patient and had been secretly indicted for this crime;

(D) making unfounded accusations that Henderson and other officers "were behind" drug distribution within the facility; and

(E) failing to produce any evidence of these allegations and failing to contact Office of Mental Health and Substance Abuse or Department of Health & Human Resources management above Henderson. Plaintiff timely appealed the suspension to the State Civil Service Commission.

5. Pursuant to a request made by Brittain, employees of the Department of Justice searched their files to verify whether "Pat Price" had contacted the Civil Rights Division regarding the Feliciana Forensic Facility. In a letter dated September 9, 1982, Stephen Whinston, the Senior Trial Attorney of the Special Litigation Section, informed Brittain that they had not been able to locate any correspondence or documents relating to "Pat Price."

6. On September 15, 1982, Brittain wrote a letter to plaintiff informing him that the investigation had been completed [2] and stating numerous reasons for terminating his position as a social worker at the facility. Plaintiff was not afforded any additional hearing prior to the termination. In the letter, Brittain outlines the evidence of plaintiff's misconduct which is summarized as follows:

(A) statements from staff and patients purportedly verifying the allegations relating to plaintiff's spreading rumors as to the "murder" of a patient;

(B) plaintiff should have been aware of the fact that an investigation had been made by the facility and the East Feliciana Parish Sheriff's Office and that the patient's death had been ruled a "suicidal hanging;"

(C) statements from staff and patients showing plaintiff had made "unfounded and undocumented" allegations regarding drug trafficking and possession against staff and patients;

(D) statements showing plaintiff had engaged in activities conflicting with his role as a therapist and that were not part of his assigned duties, including (i) unsubstantiated statements that he was working with the FBI, Justice Department, State Police and a grand jury and (ii) soliciting patient business for an attorney, Brooks Hester, who was a former employee of Feliciana Forensic Facility.

7. The termination letter concludes that plaintiff's further employment would be detrimental to the state and the facility and might even jeopardize plaintiff's personal welfare considering the extent of patient distrust (evidenced by a petition circulated by patients against plaintiff). In determining the severity of the disciplinary action, Brittain considered the November 2, 1981 letter of reprimand and prior counseling against making unfounded statements or allegations. Plaintiff timely appealed the termination to the State Civil Service Commission.

8. The termination letter and testimony at trial demonstrates the need for trust among patients and with the staff. It is clear that such an atmosphere of distrust among criminally insane patients, coupled with the failure to report within the facility, "could contribute to a volatile and dangerous situation."

9. By letter dated November 24, 1982, (by which time Brittain had himself left state service) the Justice Department attorney previously contacted by Brittain informed Rahn Sherman (Brittain's successor

---

**2.** James Hawkes, the Chairman of the investigating committee, indicated that he thought further investigation of the facts was warranted.

at the facility) that they had in fact received a tape recording and a letter from plaintiff and perhaps a phone call. The attorney explained that these contacts were not discovered until after the letter to Brittain had been dispatched due to a difference in identification between James Patrick Price and "Pat Price" and the "volume of information regarding Feliciana Forensic Facility ... accumulated from numerous sources."

10. Plaintiff testified at trial that he was terminated because he had reported beatings of patients, thefts from patients and drug pushing by staff members to the FBI, DEA and Justice Department. Plaintiff testified that he became aware of a civil rights investigation of the facility by the Justice Department and that he assisted patients by sending their letters to the Department and letting them use the phone to call the Department. He denied telling people that he was working for the Justice Department but stated that he had openly assisted patients with their lawsuits against the facility. Plaintiff indicated he had reported some of these incidents to staff members but nothing had been done. Plaintiff did not decisively deny all of the charges against him; plaintiff testified that it was "common gossip" that the death of patient # 96 was not suicide. He did not deny spreading the "common gossip." Plaintiff did, however, convincingly testify that he was never given an opportunity to appear before the investigating committee.

11. According to Brittain's testimony, plaintiff was terminated for his disruptive activities at the facility, that is, spreading rumors of rampant drug use and murder plots and playing "cops and robbers" rather than following agency procedures for reporting criminal incidents. Brittain testified that plaintiff had told him that he did not report incidents to anyone in the chain of command at the facility because he did not trust anyone at the facility or Department of Health & Human Resources. Brittain further testified that plaintiff's unau-

thorized release of information to outside authorities was one of the factors leading to his termination but would not have been sufficient, in and of itself, to justify his termination.

12. Henderson testified that plaintiff created anxiety among the patients by telling them a "bunch of nonsense" about being an undercover agent for the FBI and how Henderson had murdered patients and been indicted by a secret grand jury. Henderson told plaintiff that he considered it "disloyal" not to report the "Tolarsky incident" within the facility.

13. Suzanne Dendy, a security officer at Feliciana Forensic Facility testified that plaintiff said a lot of "off the wall things" about FBI investigations, and Henderson being responsible for a patient's death and drug traffic within the facility. She also testified that plaintiff asked her to delay reporting the "Talarsky incident" in order to give him time to set up a "state police raid." She refused.[3]

14. Ultimately, the court concludes that a preponderance of the evidence proves that plaintiff was terminated primarily for disrupting patient and employee relationships by disclosing confidential patient information and spreading rumors and wild, unsubstantiated stories relating to purported criminal activity by patients, Henderson and staff, as well as overemphasizing his own ability to right purported wrongdoing at the facility. Although there is evidence that defendants were partially motivated by plaintiff's reporting to outside sources, the court is convinced that plaintiff would have nevertheless been terminated for the reasons stated above. The court specifically finds that plaintiff's involvement in the federal civil rights action was not a motivating factor since defendants had been informed at the time the decision to terminate plaintiff was made that he was not actually involved with the Justice Department.

---

**3.** This was the incident for which plaintiff was reprimanded. It should be noted that Ms. Dendy, not plaintiff, developed the information on the case and that plaintiff had no official duty to report it to anyone. Ms. Dendy did, in fact, report the matter promptly to her superiors and the staff member who was involved with the patient was discharged.

15. Plaintiff voluntarily withdrew both his appeals to the Civil Service Commission in July of 1985.

Conclusions of Law

1. The court has jurisdiction under 28 U.S.C. § 1331 and § 1343(a)(3).

■ 2. The court finds that plaintiff's claims under 42 U.S.C. § 1997d have no merit. Pretermitting the issue of whether plaintiff has a private right of action directly under § 1997d or a right of action via 42 U.S.C. § 1983, it is clear that plaintiff has no cause of action under § 1997d, which prohibits retaliation "in any manner" against a person "reporting conditions which may constitute a violation under this subchapter" (the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, et seq.).

3. The Civil Rights of Institutionalized Persons Act was enacted primarily to ensure that the Attorney General of the United States has "legal standing to enforce existing constitutional rights and Federal statutory rights of institutionalized persons." H.R.Conf.Rep. No. 96–897, p. 9 (1980), U.S.Code Cong. & Admin.News 1980, pp. 787, 833. The Act authorizes the Attorney General to initiate or intervene in a civil action on behalf of state institutionalized persons subject to "egregarious or flagrant conditions of confinement" which deprive them of their constitutional or federal statutory rights, where such deprivation is pursuant to "a pattern or practice of resistance to the full enjoyment of such rights." See 42 U.S.C. § 1997a and § 1997c.

4. In this case, not only has the court found that plaintiff would have been terminated despite his "outside reporting," the evidence of possible retaliation relates solely to isolated incidents of "murder," theft, and some substance abuse. The weight of the evidence supports a finding that de-fendants did not retaliate against plaintiff for assisting patients with civil rights litigation since defendants were unaware that plaintiff was doing this.

■ Nor was there any evidence clearly establishing the extent of defendants' knowledge relating to reporting of drug pushing. In short, plaintiff failed to prove that he was retaliated against for reporting "egregious or flagrant conditions of confinement" which might have deprived patients at Feliciana Forensic Facility of their constitutional or federal statutory rights, pursuant to "a pattern or practice of resistance to the full enjoyment of such rights." Consequently, plaintiff cannot recover under § 1997d.[4]

5. In connection with plaintiff's freedom of speech claims, the initial inquiry is whether the statements made or activities engaged in by the public employee were directed to a matter of public concern. *Rankin v. McPherson,* —— U.S. ——, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). If so, the court must balance the employee's interest in engaging in such activities against the various legitimate interests the governmental employer may have. Id. This determination is made considering the manner, time and place, as well as the context, of the speech or activity.

6. If the foregoing balance favors the employees, then the court must decide whether the employee's constitutionally protected speech or activity was a "substantial" or "motivating factor" in the employer's adverse decision; and, if so, whether the employer has demonstrated that it would have made the same decision even in the absence of the protected activity. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Kelleher v. Flawn,* 761 F.2d 1079 (5th Cir.1985).

---

4. Although not specifically raised by plaintiff, the court notes that plaintiff could possibly have a constitutionally protected right not to lose his job for "blowing the whistle" to federal authorities in light of *Williams v. Allen,* 439 F.2d 1398 (5th Cir.1971) (finding a police officer had stated a cause of action under § 1983 by alleging he had been terminated in retaliation for having reported acceptance of lottery payoffs by police officers to the IRS). However, as the court has found that defendants were substantially motivated by plaintiff's internal activities, plaintiff cannot recover on this basis.

■ 7. In this case, at least some of plaintiff's statements and activities were directed to matters of public concern [5] and are protected by the first amendment. However, the balancing test produces mixed results with respect to plaintiff's activities within and without the facility. In connection with his internal activities, plaintiff's interests in disclosing statements made by patients in confidence and spreading rumors of murder plots and drug pushing are clearly outweighed by the interests of defendants in maintaining order within the facility. It ought to be understood that plaintiff's "information" consisted almost exclusively of unsubstantiated rumors, with little or no actual evidence. Plaintiff acknowledged the need for patient confidentiality when working with substance abuse patients, some of which he termed "extremely dangerous." The need for prompt and accurate reporting of dangerous or illegal activity within such a facility is obvious. Consequently, the court finds that defendants did not violate plaintiff's First Amendment rights in terminating plaintiff for his activities within the facility.

■ 8. As to plaintiff's attempting to bring to light potential wrongdoing by reporting outside of the facility, the court is not persuaded that defendant's interests outweigh those of plaintiff. However, as noted above, the court is not convinced that plaintiff's outside reporting was a substantial factor in his termination. The court concludes that defendants would have taken the same action even in the absence of this activity, precluding recovery under the First Amendment.

■ 9. Turning to plaintiff's due process claims, it appears that plaintiff may have been denied due process. Clearly, plaintiff had a property interest in public employment as a permanent civil service employee. *Murray v. Dept. of Revenue and Taxation,* 504 So.2d 561 (La.App. 1st

Cir.1986), writ denied 504 So.2d 880, 882, 883 (1987). Therefore, the due process clause required "some kind of a hearing" prior to his termination. The formality and procedural requisites for the hearing can vary depending upon the importance of the interests involved and the nature of the subsequent proceedings. *Cleveland Board of Education v. Lousermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

■ 10. The testimony presented did not conclusively show whether plaintiff was afforded an effective opportunity to rebut the reasons for his suspension at the meeting on June 25, 1982. The meeting with Brittain on that date may well meet constitutional standards. Nevertheless, the court finds that defendants are entitled to qualified immunity since their conduct did not violate "clearly established" due process rights "of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Compare *Thurston v. Dekle,* 531 F.2d 1264 (5th Cir.1976), reversed on other grounds, 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978) (requiring "risk reducing procedures" prior to termination, including written notice of reasons for termination and an effective opportunity to rebut those reasons) with *Weisbrod v. Donigan,* 651 F.2d 334 (5th Cir. 1981) (finding the State had violated no clearly established due process right when it discharged a civil service employee without any pretermination hearing). See *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). The court further observes that state procedure at that time specified post suspension and post termination hearings, not pretermination. The state civil service rule governing removal for cause has just recently been found by a state court to violate due process in that it failed to provide the employee an opportunity to respond either in writing or orally to the appointing authority prior to termination. *Murray v. Depart-*

---

**5.** Defendants failed to conclusively prove that plaintiff's statements were knowingly false or in reckless disregard of the truth. See *Reev~s v. Claiborne County Bd. of Educ.,* 828 F.2d 1096 (5th Cir.1987). The information given in confi-

dence by patients might not be a matter of public concern. The parties have lumped all of the statements together not identifying the actual source or content.

*ment of Revenue and Taxation,* 504 So.2d 561 (La.App. 1st Cir.1986), writs denied, 504 So.2d 880, 882, 883 (1987). Plaintiff has failed to establish that at the time of his suspension and discharge failure to hold a pretermination hearing was a clear violation of his constitutional rights of which a reasonable state official would have known. *Weisbrod v. Donigan,* supra.

11. Finally, plaintiff seeks to recover under pendent state law negligence claims. Plaintiff argues in his post-trial brief that he should be allowed to recover on the basis of Brittain's negligence in failing to use his full name (James Patrick Price instead of "Pat Price") when making the inquiry to the Justice Department. Even if this claim had merit, there is no basis for such a tort action under state law. See *Foreman v. Falgout,* 503 So.2d 517 (La.App. 1st Cir.1986) (the State Civil Service Commission has exclusive jurisdiction over such tortious actions).

For the foregoing reasons, there will be judgment in favor of defendants.