James Patrick PRICE,
Plaintiff–Appellant,

v.

Thomas H. BRITTAIN, Jr., et al.,
Defendants–Appellees.

No. 88–3342.

United States Court of Appeals,
Fifth Circuit.

May 31, 1989.

James C. Ferguson, Brooks E. Hester, Baton Rouge, La., for plaintiff-appellant.

Fernin F. Eaton, Baton Rouge, La., for defendants-appellees.

Before GEE, SMITH, and DUHE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

We consider here the thin line between disruptive rumor-spreading and protected "whistle-blowing" in a civil service employee discharge case. Plaintiff, James Patrick Price, was a social worker employed at the Feliciana Forensic Facility, a Louisiana state mental health hospital, until his termination on September 15, 1982. Defendant Thomas Brittain, Jr., Assistant Secretary of the State Department of Health and Human Resources ("DHHR"), terminated Price for having spread unsubstantiated rumors, failing adequately to protect the confidential records of patients, and failing to report, to his superiors, violations of law occurring within the facility. Price brought suit against his immediate superiors and the secretary and deputy secretary of the Louisiana DHHR[1] pursuant to 42 U.S.C. §§ 1983 and 1997d, and the first, fifth, and fourteenth amendments to the Constitution. After a bench trial, the district court held for defendants. 684 F.Supp. 1345 (M.D.La.1988). Price appeals, contending that his termination: (1) was in retaliation for his exercise of his first amendment rights; (2) was effected without the procedural due process guarantees to which he was entitled; and (3) was in retaliation for statutorily protected "whistle-blowing." Agreeing with the district court that Price cannot recover under any of these theories, we affirm.

## I. A Tempest at the Feliciana Forensic Facility.

The Feliciana Forensic Facility ("the facility") houses involuntarily-committed mental patients. Price's embattled employment at the facility began in June 1981. He served as a social worker in the drug and alcohol abuse program, leading discussion groups and providing therapy to individual patients.

### A. Price's Story.

Price was reprimanded by letter in November 1981 for having sidestepped the chain of command and directly reported to state police officers a sex-for-drugs exchange between one of the facility's security officers and a patient (the "Talarsky incident"). Price claims that taking the information directly to the state police was made necessary by his promise to the patient that the information would not be reported within the facility.[2] C. Murray Henderson, chief executive officer of the facility, also gave Price an oral reprimand and told Price, in allegedly angry tones, that he could tolerate stupidity but not disloyalty.

Price claims to have been aware of numerous other unlawful activities occurring at the facility, including the sale and distribution of drugs by security officers and patients, beatings of patients by security officers, and borrowing or stealing of money from patients by officers. He stated at trial that he turned this information over to his immediate superiors, i.e., Catherine

---

1. The district court dismissed the secretary and deputy secretary at the close of plaintiff's evidence pursuant to Fed.R.Civ.P. 41(b) (involuntary dismissal), finding that neither had any connection with Price's termination. Price does not appeal the dismissals.

2. The incident in fact was reported within the facility by security officer Suzane Dendy, a witness at Price's trial. The record indicates that after an investigation, the officer involved was terminated.

Goodman, director of the social services program, and Dr. Augusto Abad, a staff psychiatrist and the coordinator of the drug and alcohol abuse program. When these individuals allegedly refused to acknowledge his information or do anything to rectify the problems he had identified, Price contacted a federal district judge, who referred him to the Federal Bureau of Investigation ("F.B.I."). Price purportedly then contacted F.B.I. agent Watson concerning drug-pushing at the facility; however, when contacted later by defendant Brittain, Watson reported that he had had no contact with Price.

In addition, Price was aware of a Justice Department suit against the facility for alleged violations of patients' civil rights. Price sent his information, including a tape, to Dan Butler of the department, and assisted patients in mailing letters and making phone calls to the department from the facility. Butler later confirmed that he had had communications with Price, though that confirmation came long after Price had been suspended, and then terminated, from his employment.

Other information which Price claims to have received from patients was even more sinister in nature. Price heard that a patient who had apparently committed suicide in the facility had in fact been murdered by two other patients, at the behest of or with the knowledge of Henderson.[3] Price also was told that Henderson allowed one of the two patients who allegedly had committed the murder to leave the facility occasionally in the company of an off-duty security officer who was paid to chauffeur the patient to various destinations.

Price maintains that at a meeting shortly after, and in connection with, the Talarsky incident, he informed Abad, Goodman, and a senior security officer, Captain Landry, of his communications to various outside officials. Thus, he contends that defendants Henderson and Brittain knew or should have known of his reports to law enforcement agencies, by virtue of the fact that Abad and Goodman, as well as Landry, all normally reported to Henderson and Brittain. In April 1982, Abad and Goodman evaluated Price's job performance as "satisfactory."

## B. Defendants' Version.

Defendants depict Price's actions in a much less favorable light; they characterize Price as a rumor-monger who was playing "cops and robbers" within the facility in order to enhance his own image among patients and staff, and who breached patient confidentiality in his efforts to drum up business for his friend, Brooks Hester, an attorney and former social-service worker at the facility. They further claim that Price irresponsibly aggrandized his own position by telling patients and staff that he was working for the F.B.I. and the Justice Department, with the effect of causing the patients to mistrust both the staff and their fellow patients. The strongest allegation of malfeasance against Price concerns his alleged indiscretion in repeating to staff and patients the rumor that Henderson had arranged the murder of a patient, even though he knew that state authorities had investigated the death and ruled it an obvious suicide.

On June 24, 1982, Henderson suspended Price; Brittain, however, immediately countermanded the suspension order and arranged a meeting with Price for that afternoon. Price arrived at Brittain's office with his attorney, but Brittain refused to allow the attorney to attend the meeting and "reminded" Price that if he insisted upon his attorney's presence, his actions might be considered insubordination and just cause for termination.

Price left his attorney outside the meeting. Reports of what occurred inside conflict: Brittain maintains that he first elicited from Price any information he had about unlawful activities going on at the facility and asked him to share any specific information or documentation which Price had obtained. He then testified that Price

---

3. The extent to which Price "spread" this rumor among patients and staff was a subject of some dispute between Price and his superiors. The allegation that he had irresponsibly spread the rumor headed the list of charges against Price in his termination letter.

was unable to provide any such specifics or documentation; Brittain told Price that a suspension and investigation was necessary because Price's allegations were so disruptive and inflammatory, and that Price had endangered the safety of all individuals at the facility, including his own.

Price, however, asserts that at the meeting he told Brittain about his contacts with outside law enforcement authorities and explained his reasons for those contacts. He further asserts that Brittain then summarily suspended him, without pay and without providing any justification for doing so. Brittain did, however, send Price a letter on July 8, 1982, detailing the reasons for his suspension.

Brittain then empaneled an investigating committee consisting of disinterested officials from the state DHHR. However, James Hawkes, a division director with the Office of Mental Health who chaired the committee, testified that the committee was unable to uncover sufficient factual evidence to support either side in the matter.

### C. A Thick Pink Slip.

Brittain sent Price a termination letter dated September 15, 1982, and effective September 24. The letter provides, in some detail, the reasons for Price's termination. The first reason is that Price had made "flagrant, prejudicial, irresponsible, and inflammatory" statements on several occasions, to both staff and patients, concerning the purported murder at the facility and Henderson's alleged role in that murder. Goodman reported that Price had made such a statement to her, Abad reported that several of his patients complained that Price had made such statements to them, and several patients corroborated these reports.

Second, the letter cites Price's unsubstantiated statements regarding drug-pushing by senior members of the staff and security officers. The letter charges that Price continued to make these statements to staff and to patients even after Abad had warned Price not to make such unfounded accusations.

Third, the letter charges Price with engaging in activities "in conflict with [his] role as a therapist," including making unsubstantiated claims that he was working with the F.B.I. and the Justice Department, soliciting patient business for attorney Hester, and creating the impression among several patients that he could influence the outcome of proceedings pertaining to the patients' confinement or release status. The most damaging specific example within this category involves a claim that, in the process of soliciting business for attorney Hester, Price showed a patient his name, prognosis, and prescribed medication—information displayed on a list of patients named to return to court. As the list also contained the same confidential information about the other patients scheduled to return to court, Price was accused of a grave breach of patient confidences.

Fourth, Price's actions were said to be in conflict with his role as a social worker. The letter states that because his employment required direct contact with patients and because those actions may have created mistrust or ill-will, Price might have jeopardized his own personal welfare. The letter cited as evidence of this danger a petition, signed by twenty-two patients and dated June 22, 1981, stating that they did not want Price leading their therapy groups.

Finally, the letter also included a list of the factors taken into account in determining the severity of the termination action. These included the letter of reprimand regarding the Talarsky incident, Abad's warning to Price that he should refrain from making unsubstantiated allegations, and Price's wanton disregard for both his employer and the welfare of the patients at the facility.

### II. *Free Speech in the Workplace.*

◼ A state may not discharge an employee for exercising his right to free speech on matters of public concern. *Page v. DeLaune,* 837 F.2d 233, 237 (5th Cir. 1988). Supreme Court jurisprudence, as well as our own, has recognized our society's strong interest in protecting public em-

ployees who have the courage to "blow the whistle" on wrongdoings in public institutions.[4] As the Court has emphasized, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions, but simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). Thus, the managerial authority of supervisors and administrators must be tempered by concerns for the public's need to be informed of the actions and inactions of those whom it has hired to implement policy.

■ However, we have also recognized a competing concern in the form of disruption of the workplace. *See Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. When the interests of employee and employer clash, courts must balance the concerns of each in determining, as a first inquiry, whether the employee's speech deserves first amendment protection. *Rankin*, 107 S.Ct. at 2896; *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977). Courts therefore weigh "the interests of [the employee] as a citizen in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734.

■ In cases such as the one before us, the employee bears the initial burden of demonstrating that his speech was constitutionally protected and that it was a "substantial" or "motivating" factor in the termination decision. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. However, if the employee meets that burden, it then becomes the employer's burden to prove that the employee would have been terminated even in the absence of protected conduct. *Id.*

**A. The Balancing Test Applied.**

■ Thus, the threshold question we face here is whether the employee's speech activities deserve first amendment protection because they may be "fairly characterized as constituting speech on a matter of public concern." *Rankin*, 107 S.Ct. at 2897 (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689–70, 75 L.Ed.2d 708 (1983)). The question is answered by examining "the content, form, and context of a given statement as revealed by the whole record." *Id.*

The district court found that at least some of Price's statements and activities were directed to matters of public concern and therefore protected. The court drew a distinction between Price's statements "within" the facility and those made "outside" the facility, finding that the statements made within the facility "consisted almost exclusively of unsubstantiated rumors, with little or no actual evidence." The court concluded that, given the volatility of the patients at the facility, the need for security, and hence, the need for prompt and accurate reporting of unlawful activity, the disruption and danger which Price's internal statements presented for the facility far outweighed any of Price's free-speech interests in making those statements.

■ Though in other circumstances we would defer to the factfinding of the district court with respect to the content, form, and context of the speech, cases involving the exercise of first amendment rights in the workplace require a different standard of review. Our review "is limited in this context by our constitutional obligation to assure that the record supports [the court's] conclusion: '[W]e are compelled to examine for ourselves the statements in issue and the circumstances under which they [were] made to see whether or not they … are of a character which the

**4.** *See Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 414–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed. 2d 811 (1968); *Brawner v. City of Richardson*, 855 F.2d 187, 191–92 (5th Cir.1988); *Brown v. Texas A & M Univ.*, 804 F.2d 327, 337 (5th Cir.1986); *Day v. South Park Ind. Sch. Dist.*, 768 F.2d 696, 700 (5th Cir.1985), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986).

principles of the First Amendment ... protect.'" *Rankin, id.* (quoting *Connick,* 461 U.S. at 150 n. 10, 103 S.Ct. at 1691–92 n. 10).

After our own review of the record, we do not find the distinction between Price's internal and external statements as marked, and consequently do not find that, with respect to the constitutional protection to be afforded to the "internal" statements, the balance tips so obviously in favor of defendants. "A public employee who engages in whistleblowing does not 'forfeit[ ] his protection against governmental abridgement of freedom of speech if he decides to express his views privately rather than publicly.'" *Brown,* 804 F.2d at 337 (quoting *Givhan,* 439 U.S. at 414, 99 S.Ct. at 696).

■ Hence, many of Price's "internal" statements could be considered protected speech along with his reports to outside authorities. First among these would be Price's informing patients that they had the right to obtain outside legal counsel and prosecute civil actions against officials within the facility who were mistreating them. Further, Price stated that he informed many of the patients that they could contact the Justice Department with information regarding the civil suit pending against the facility. In fact, he claims to have assisted some patients in doing so.

The defendants do not deny that Price gave this advice, nor are they able to controvert the truth of these statements. Thus, we cannot dismiss, as did the district court, all of Price's internal statements as unsubstantiated rumor, even if Price was engaged in some self-aggrandizement in the process.[5] As we turn to the task of balancing Price's free-speech interests against the facility's concern for orderly administration, we therefore find Price's

interests weightier than did the district court.

Following the Supreme Court's lead, in assessing the weight to be accorded to the plaintiff's free-speech interests we also consider the extent to which that speech implicates matters of public concern. *See Connick,* 461 U.S. at 152, 103 S.Ct. at 1692–93.[6] Without doubt, the welfare of the patients at such a facility and the protection of their civil rights are matters of serious public concern. For this reason, we find Price's first amendment interests to be still greater.

Nonetheless, at the end of this sophisticated balancing test we reach the same result as did the district court. We base our decision chiefly upon the context in which Price made his statements: The facility houses individuals who are disturbed and dangerous, many of whom are doubtless paranoid or prone to hostile reaction. Statements to patients and staff about drug-pushing, beatings, and even murders, which might otherwise be speech deserving the highest degree of protection, become, in these circumstances, dangerously disruptive. Brittain observed in his testimony that

the facility itself was old, dilapidated, did not have the layout that allowed for adequate movement of the patients, did not have the layout that [made] for easy observation [by] correctional officers, did not have the proper staffing, [and] did not have a lot of things that it needed.... Now, in the midst of that kind of shortage of manpower, dealing with very volatile patients, some of whom were committed to [the facility] for very heinous crimes, where they had both a judgment of being a criminal and also criminally insane, ... we had to manage that facility.... It was in that kind of envi-

5. Price's communications within the facility therefore are distinct from those we have held in the past to be unprotected "internal" statements about non-public concerns. *See Noyola v. Texas Dep't of Human Resources,* 846 F.2d 1021, 1024 (5th Cir.1988) (complaints about welfare case load); *Terrell v. University of Tex. Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986) (personnel policies of university police); *Day,* 768

F.2d at 700–01 (unfavorable employee evaluation).

6. The *Connick* Court cautioned "that a stronger showing [by the employer] may be necessary if the employee's speech more substantially involved matters of public concern."

ronment that Mr. Price was creating the disruption that we had mentioned earlier. Hence, we conclude that here the employer's need to prevent disruption and violence was paramount. Price's communications to the staff and patients of the facility therefore were not protected expression.[7]

However, the balancing test does not produce the same results when applied to Price's direct communications with the Justice Department and other law enforcement agencies. We agree with the district court that these statements must be considered protected speech, since they can be considered disruptive only in the sense that they assisted the government in a self-policing action already underway. There are no competing concerns regarding fomenting mistrust among patients and staff. *See Brown*, 804 F.2d at 337.

### B. *Defendants Must Show Why They Did What They Did.*

█ Accepting that Price's communications with the Justice Department and any other outside authorities were protected speech, the question now becomes whether the defendants can prove that these communications were not the predicate for their decision to terminate Price. Our review of the record indicates that they were not.

Brittain contends that he did not hear of Price's communications with outside authorities until his meeting with Price on the day he suspended him. Moreover, Brittain maintains that during his investigation of Price's allegations he was unable to con-

firm the existence of these communications. The record partially supports that testimony in that it contains a letter from the Justice Department disavowing any communications with a "Pat Price" in connection with the litigation against the facility.[8]

Price could provide no proof that Brittain and Henderson were made aware of his outside communications. His only argument at trial was that Brittain and Henderson *should have known* by virtue of the fact that Price had informed Abad and Goodman about his outside communications. However, as Price's attorney astutely observed in oral argument before this court, Brittain had every reason to believe that Price's claims were not fictitious, since earlier Price in fact had contacted state authorities concerning the Talarsky incident. The issue thus becomes one of assessing the credibility of Brittain with respect to his knowledge of Price's outside communications and the weight he gave to those communications at the time he determined that Price should be terminated.

Although *Rankin* instructs us to engage in our own review of the record, we recognize that this review cannot be completely *de novo* when, as here, the record alone does not fully answer the question whether the plaintiff would have been terminated despite his protected-speech activities. As we have often emphasized in other contexts, an appellate tribunal's scrutiny of the record cannot replace the district court's personal experience with the witnesses.[9] Here, we cannot escape the fact

---

**7.** *See Pickering*, 391 U.S. at 569–70, 88 S.Ct. at 1735–36. There, the Court emphasized that the appellant's statements were "in no way directed towards any person with whom the appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here." In *Day*, we interpreted this passage from *Pickering* to mean that a public employee "cannot be discharged for making statements on a matter of legitimate public concern unless the statements are shown to have interfered with the proper performance of the [employee's] daily duties." 768 F.2d at 700.

**8.** Subsequently, but unfortunately sometime after Price's termination and Brittain's departure,

the attorney in charge of the Justice Department litigation against the facility realized that "Pat Price" and "James Patrick Price" were one and the same person. He then sent a follow-up letter, explaining that, indeed, the department had received information and a tape from Price. Brittain's use of the name "Pat Price" evidently was prompted by the fact that "Pat Price" was Price's "nom de voix" at the facility.

**9.** *See Bartimo v. Horsemen's Benevolent & Protective Ass'n*, 771 F.2d 894, 898 (5th Cir.1985), *cert. denied*, 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986). There, we decined to review the credibility findings of the district court, even though, pursuant to *Bose Corp. v. Consumers Union of the United States*, 466 U.S.

that in this case, the district court's credibility determinations were crucial.[10] The district court chose to credit Brittain's testimony that he had not been aware of Price's outside reports to the Justice Department and the F.B.I. when it found that Brittain terminated Price primarily for the internal disruptions he had caused.[11]

The district court's credibility determination becomes persuasive in light of the fact that at the time Brittain terminated Price, Brittain had been assured by the Justice Department that they had had no communications with "Pat Price." Hence, we hold with the district court that even if Price's outside reporting of the Talarsky incident was the substantial or motivating factor in his termination, he nevertheless would have been terminated because of his disruptive influences within the facility.

### III. *What Process Was Due?*

Price contends that the pre-suspension meeting he had with Brittain was insufficient process to protect the property interest he enjoyed as a tenured employee of the state. We agree that Brittain's precipitously-called "conference," held without the opportunity to gather evidence and marshal arguments and without the benefit of counsel, does indeed raise due process issues. However, we need not resolve those concerns here, since we hold, as the district court did, that the defendants' qual-

ified immunity precludes an award of damages on this issue.

■ Whether state officials enjoy qualified immunity turns on the objective legal reasonableness of their conduct, assessed in light of the legal rules that were clearly established at the time of their actions. *See Hodorowski v. Ray,* 844 F.2d 1210, 1216 (5th Cir.1988). Our inquiry therefore turns on whether a reasonable official would have known that a hastily-called conference, at which Price was permitted to state and explain his version of the allegations he had been making concerning unlawful activities among the patients and staff at the facility, violated clearly established due process rights. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Matherne v. Wilson,* 851 F.2d 752, 756 (5th Cir.1988).

The district court found the immunity defense conclusive on the ground that Fifth Circuit law at the time was in conflict, and the Supreme Court had not yet spoken on the application of due process principles to this specific context. Furthermore, the court observed, state procedures at the time called for post-suspension and post-termination hearings, rather than pre-suspension and pretermination hearings.

We agree with the district court's assessment of defendants' qualified immunity defense. The rule in this circuit prior to *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494

---

485, 499, 104 S.Ct. 1949, 1958–59, 80 L.Ed.2d 502 (1984), we undertook an independent review of the district court's finding that the editors of a magazine bore no actual malice in publishing an allegedly libelous article concerning the plaintiff. *See also Tavoulareas v. Piro,* 759 F.2d 90, 107–09 (D.C.Cir.) (holding that *de novo* review of district court rulings on issues involving constitutional fact is limited to the "ultimate constitutional fact" and declining to review the court's credibility determinations), *vacated and reinstated in relevant part,* 763 F.2d 1472, 1479–80 (D.C.Cir.1985) (opinion on petition for rehearing), *cert. denied,* —— U.S. ——, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). We observe that the issues presented in *Bartimo* and *Piro* concerning the scope of independent review in libel cases are before the Supreme Court this term in an appeal from a Sixth Circuit case. *See Connaughton v. Harte-Hanks Communications, Inc.,* 842 F.2d 825 (6th Cir.1988), *cert.*

*granted,* —— U.S. ——, 109 S.Ct. 257, 102 L.Ed.2d 245 (1988).

**10.** *See Thornbrough v. Columbus & Greenville R.R.,* 760 F.2d 633, 641 (5th Cir.1985) (determinations of motivation and intent depend upon complicated inferences from evidence and are therefore peculiarly within the province of the fact-finder).

**11.** The court concluded:

Ultimately, ... a preponderance of evidence proves that plaintiff was terminated primarily for disrupting patient and employee relationships.... Although there is evidence that defendants were partially motivated by plaintiff's reporting to outside sources, the court is convinced that plaintiff would nevertheless have been terminated for the reasons stated above.

644 F.Supp. at 1349.

(1985),[12] and *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984),[13] required that there be some form of hearing before an employee was deprived of a constitutionally-protected property interest in his employment. *See Glenn v. Newman*, 614 F.2d 467, 472 (5th Cir.1980) (citing *Board of Regents v. Roth*, 408 U.S. 564, 569–70 & n. 8, 92 S.Ct. 2701, 2704–05 & n. 8, 33 L.Ed.2d 548 (1972)). In *Glenn*, we restated the procedural due process requirements we had established in an earlier case, *Thurston v. Dekle*, 531 F.2d 1264, 1272 (5th Cir.1976), *vacated on other grounds*, 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978) (Mem). We held that prior to termination, due process required "written notice of the reasons for termination and an effective opportunity to rebut those reasons. Effective rebuttal means giving the employee the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision." *Glenn*, 614 F.2d at 472.

█ However, these requirements were not absolute, because in *Glenn* we went on to declare that any error committed by supervisors or managers in not adhering to the pretermination requirements could be cured by subsequent post-termination proceedings. *Id.* [14] Thus, at the time of Price's termination, this circuit's caselaw did indeed require pretermination procedures, but the mandatory character of those procedures was obfuscated by the qualification that adequate post-termination proceedings could cure any pretermination lapses. We therefore conclude that even if Brittain's conference with Price did not constitute an effective opportunity to respond to the charges and thereby violated Price's due process rights, the status of a state employee's pretermination procedural rights was sufficiently uncertain in 1982, when the supervisors of state agencies did not have the benefit of either *Davis* or *Loudermill* to inform their personnel decisions; hence defendants may avail themselves of the qualified immunity defense.[15]

█ Price, however, claims that the facility's employee handbook made the contours of his procedural due process rights clear to defendants.[16] Yet *Davis* foreclos-

**12.** In the two cases consolidated in *Loudermill*, public employees were discharged without any pretermination hearing, one in November 1980 and the other in August 1977. Balancing the impact of the termination upon the employee against the employer's need for order and control, the Court held that procedural due process requires some pretermination opportunity to respond to the charges that led to dismissal. 470 U.S. at 542, 105 S.Ct. at 1493. Specifically, the Court explained, that means that the employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. *Id.* at 546.

**13.** In *Davis*, the Court upheld the qualified immunity defense and rejected the plaintiff's claim that "the federal constitutional right to a pretermination or a prompt post-termination hearing was well established in the Fifth Circuit at the time of the conduct in question (1977)." 468 U.S. at 191–92, 104 S.Ct. at 3017–18. The Court noted our decision in *Weisbrod v. Donigan*, 651 F.2d 334 (5th Cir. Unit B July 1981), in which we upheld a qualified immunity defense because the plaintiff/civil service employee was unable to cite authority in support of her claim that her superiors had violated a clearly-established due process right when she was discharged without any pretermination hearing.

**14.** *See also Stenseth v. Greater Fort Worth & Tarrant County Community Action Agency*, 673 F.2d 842, 846 (5th Cir.1982) (though pretermination proceedings may have been inadequate because of lack of formality, post-termination proceedings were sufficient to cure the defect since plaintiff had not demonstrated any prejudice resulting from the failure to provide pretermination due process).

**15.** *See Page*, 837 F.2d at 239, where we held that in December 1982 the right to pretermination notice and an opportunity to respond was "clearly established," but did not answer "the more difficult questions of how much notice and opportunity are required." Because Brittain's presuspension meeting with Price necessarily raises those more difficult questions here, we cannot conclude that Price has met his burden of showing that Brittain violated a clearly-established right. We emphasize again that those questions were not definitively answered until the *Loudermill* decision in 1985.

**16.** The handbook states that prior to imposing any sanction upon an employee for a rule or policy breach, the department head shall meet with the employee to discuss the case and give him a "full opportunity to present his side of the story." The handbook further provides that the

ed this line of argument as well, stating "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." 468 U.S. at 194, 104 S.Ct. at 3019. Adhering to this dictate, we hold that employee handbooks cannot alone clarify established constitutional rights that are not themselves clear in light of preexisting law.

## IV. *Private Suits for Whistle-Blowers?*

■ Price's remaining theory for recovery asserts that he has a private right of action, under 42 U.S.C. § 1997d, for having "blown the whistle" to outside authorities regarding drug-pushing and maltreatment of patients at the facility. Section 1997d is part of the Civil Rights of Institutionalized Persons Act, and provides: "No person reporting conditions which may constitute a violation under the [Act] shall be subjected to retaliation in any manner for so reporting." Price contends that this statute creates an implied private right of action for employees, as well as inmates and patients, who report violations of civil rights and wrongdoing in institutions to outside authorities.

The district court pretermitted the question of whether an implied right of action exists under this statute on the ground that even if such an action did exist, Price had adduced no evidence of retaliation.[17] We

employee "will be permitted to have one (1) person of his choosing attend the meeting and assist him." Price complains that Brittain breached this provision by not allowing Price's attorney to attend the June 25, 1982, conference between Price and Brittain—at the end of which Brittain informed Price that he was suspended pending an investigation.

17. Brittain testified that he had contacted the individual representatives of the outside agencies with whom Price claimed to have spoken: specifically, agent Watson of the F.B.I. and members of the Justice Department involved in the litigation against the facility. According to Brittain, Watson told him that he had not communicated with a James Patrick Price. The same was true of the Justice Department, whose first letter, disavowing any contact with a "Pat Price," is part of the record.

18. The full *Cort v. Ash* analysis proceeds as follows:

find no fault with the district court's conclusion concerning the weight of the evidence against Price's claim. However, because we consider the issue of whether a private right of action exists at all under section 1997d to be at the threshold here, we address that issue and conclude that no private right of action exists.

In determining whether courts should infer a private right of action from federal law, we must examine legislative intent. *See Deubert v. Gulf Fed. Sav. Bank,* 820 F.2d 754, 758 (5th Cir.1987) (citing *Universities Research Ass'n, Inc. v. Coutu,* 450 U.S. 754, 770, 101 S.Ct. 1451, 1461, 67 L.Ed. 2d 662 (1981)). In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975), the Supreme Court provided analytical guidance for courts attempting to determine whether a private right of action can be inferred from legislative history. The first inquiry is whether the plaintiff is one of the class for whose special benefit the statute was enacted.[18]

It is upon this first inquiry that Price founders. Price was an employee of the facility and not an institutionalized person. We discern from the legislative history no intent to expand private rights of action beyond the benefited class of inmates/patients. Both the Senate Report[19] and House Conference Report[20] contain abbreviated, general expressions of intent

(1) Is the plaintiff one of the class for whose special benefit the statute was enacted?
(2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?
(3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy?
(4) Is the cause of action one traditionally related to state law, in an area basically the concern of the States, so that it will be inappropriate to infer a cause of action based solely on federal law?
*Deubert,* 820 F.2d at 758 (citing *Cort,* 422 U.S. at 78, 95 S.Ct. at 2087–88).

19. S.Rep. No. 416, 96th Cong., 2d Sess. (1979), *reprinted in* 1980 U.S.Code Cong. & Admin. News 787–832.

20. H.R.Conf.Rep. No. 897, 96th Cong., 2d Sess. (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 832.

with respect to the whistle-blower provision. The Conference Report, for example, states only that "[i]t is the intent of Congress that those who have knowledge of systematic abuse of Constitutional rights in institutions and who report such abuse to the Attorney General or other appropriate officials or interested parties shall be protected." H.R.Conf.Rep. No. 897, 96th Cong., 2d Sess. 15 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 839.

Price's strongest argument is that this statement, taken together with the language of section 1997d ("No *person* reporting conditions ...") and the Act's broad definition of "person"[21] creates a reasonable inference that Congress intended that the whistle-blower provision would also encompass employees. However, although these premises and the inference they support are taken from language that is most general, that language is bereft of any indication that a private remedy was contemplated for all who might be covered. In such circumstances, the Court has warned against engraving private rights of action upon statutory schemes:

> The Court consistently has found that Congress intended to create a cause of action 'where the language of the statute explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff in the case.' Conversely, it has noted that there 'would be far less reason to infer a private remedy in favor of individual persons' where Congress, rather than drafting legislation 'with an unmistakable focus on the benefited class,' instead has framed the statute simply as a general prohibition.

*Coutu,* 450 U.S. at 771–72, 101 S.Ct. at 1461–62 (citations omitted).

Here, there was a specific class of persons to be benefited: those committed to mental health institutions. But as to whether Congress directed its focus beyond that class in enacting the whistleblower provisions, the legislative history suggests only one extension—to parents and other relatives. The Senate Report states:

> [A] less obvious, but not less powerful force [than lack of funds] tending to inhibit institutionalized persons from asserting their legal rights is their fear of retaliation. Completely dependent on their institutional environments, residents are particularly susceptible to intimidation and frequently afraid to voice their grievances. *Parents and caring relatives* of institutionalized individuals may be equally inhibited.

S.Rep. No. 416, 96th Cong., 2d Sess. at 20 (emphasis added).

Employees are nowhere mentioned; nor are they subject to the same forms of intimidation or susceptible in the same degree as the patients and their families.[22] Thus, as we stated in *Deubert,* 820 F.2d at 759, when neither the language of the statute nor the legislative history affirmatively indicates that Congress contemplated private enforcement by persons in the plaintiff's circumstances, the *Cort* analysis need not continue. *See also Touche Ross & Co. v. Redington,* 442 U.S. 560, 579–80, 99 S.Ct. 2479, 2490–91, 61 L.Ed.2d 82 (1979) (Brennan, J., concurring).

Moreover, inferring such a cause of action would contravene the jurisprudence now governing an employee's reporting to outside authorities. As we explain in Part II, *supra,* the Supreme Court and this circuit have attempted to strike a careful balance between the employee's interest in expressing criticisms and the government employer's need to maintain order and control.[23] We have emphasized that it is espe-

---

**21.** 42 U.S.C. § 1997(3) provides: "The term 'person' means an individual, a trust or estate, a partnership, an association, or a corporation."

**22.** We note also that the vulnerability and fears of patients and their families which the Senate Report found to inhibit whistle-blowing was more than likely the sole motivating force behind the inclusion of § 1997d. The original House bill (H.R. 10) had no whistle-blower pro-

vision; the Senate bill (S. 10) did, and the section survived the conference committee.

**23.** In *Rankin,* 107 S.Ct. at 2896, the Court observed:

> This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment. On one

cially important to weigh in the employee's favor the extent to which his speech activities relate to matters of public concern. At the same time, the competing concerns of the employer must be given significant weight; an employer may legitimately require of his employees that, where practical, they report problems to administrators first. *See, e.g., Deubert,* 820 F.2d at 759; *George v. Aztec Rental Center, Inc.,* 763 F.2d 184 (5th Cir.1985). There is no indication that Congress intended to allow reports or threats of reports to outside authorities, to be a complete shield against an employer's authority to discipline its employees. *See Connick,* 461 U.S. at 147, 103 S.Ct. at 1690.

Yet, implying a private right of action for employees under section 1997d would provide just such a shield. The statute has no provision for giving due consideration to the employer's need to create an efficacious process for correcting problems at the institution. Thus, an employee who immediately reports any transgression to outside authorities would be cloaked with immunity, even though, for example, the employer might have ample means to fix the problem and might have already begun efforts toward correction. With regard to institutions such as the Felicia Forensic Facility, the sudden involvement of some outside authority might be duplicative, complicating, or generate unnecessary publicity and could "charge the atmosphere" among the patients and create tension between staff and inmates. Such an effect would run counter to the interests of the institutionalized persons whom Congress sought to protect in the first place. Hence, we conclude that Price has no cause of action under 42 U.S.C. § 1997d.

AFFIRMED.

hand, public employers are *employers*, concerned with the efficient function of their operations; review of every personnel decision made by a public employer could, in the long run, hamper the performance of public functions. (Emphasis in original).